UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
————————————————————X

FRANK RAFTER JR., THOMAS KELLY,
and SEFU SIMMS, *on behalf of themselves
and others similarly situated*,

               Plaintiffs,             **MEMORANDUM & ORDER**

    -against-                    21-cv-4588 (NRM) (LGD)

EVERLAST SIGN & SERVICE INC., *et al.*,

               Defendants.
————————————————————X

NINA R. MORRISON, United States District Judge:

Plaintiffs Frank Rafter Jr., Thomas Kelly, and Sefu Simms, on behalf of themselves and others similarly situated, assert claims under the Fair Labor Standards Act ("FLSA"), 29 U.S.C. §§ 201 *et seq.*, New York Labor Law ("NYLL"), §§ 190 and 650 *et seq.*, and regulations of the New York Compilation of Codes, Rules and Regulations ("N.Y.C.R.R."), Title 12, §§ 146-1.1 *et seq.* In addition to the named Plaintiffs, the lawsuit also includes fourteen opt-in Plaintiffs, who only assert claims under the FLSA.

At all relevant times, Plaintiffs were "installers" who worked for Defendant Everlast Sign and Service Co. ("Everlast"), which was (and is) in the business of installing and removing real estate signs in New York City and Long Island, New York. Plaintiffs' work consisted of manual labor that involved, *inter alia*, picking up real estate signs and posts, driving between designated properties of Everlast's clients, and erecting new signs and/or removing old ones. Plaintiffs were informed at the time they were each hired that they would be required to provide their own

1

vehicles to do this work and cover their own fuel and maintenance costs. They were also told they would be paid as "independent contractors." In this lawsuit, Plaintiffs allege that they should have been classified as "employees" for purposes of the FLSA and NYLL and are entitled to the wage-and-hour protections of those statutes. They seek monetary damages for Everlast's failure to provide the compensation they claim they were due, including but not limited to overtime pay and mileage reimbursements for each day worked.

After denying in part and granting in part the parties' cross-motions for summary judgment, the Court conducted a six-day bench trial in January 2025. Named Plaintiffs Frank Rafter, Tom Kelly, and Sefu Simms and opt-in Plaintiffs Mark Corrado, John Kovalksy, Gerard Pietrafesa, and James Perez testified. Defendants Alexa and Anne Tiefenworth (who are the co-owners of Everlast, a family business), Office Manager Lisa Paone, and Warehouse Manager Arthur Flynn also testified.

At the conclusion of the bench trial, the Court issued a partial verdict from the bench, making oral findings of fact and conclusions of law under Rule 52 on the question of whether Plaintiffs were independent contractors.[1] For the reasons stated on the record, the Court found that Plaintiffs had proven at trial that they were

---

[1] Although Defendants elected to go to trial on the question of whether Plaintiffs were properly classified and compensated as independent contractors, by the close of trial, they focused almost entirely on what damages, if any, Plaintiffs were entitled to receive even if they were "employees" of Everlast under state and federal law. Tr. dated Jan. 30, 2025 at 856:12–17, ECF No. 122 (defense counsel, at outset of summation, informing the Court that he would "skip the arguments" on whether Plaintiffs were independent contractors and devote Defendants' entire summation to issues related to damages).

employees under the FLSA and NYLL and were therefore entitled to the protections of these statutes, including overtime. Tr. dated Jan. 30, 2025 ("Jan. 30 Tr.") 901:10–907:14, ECF No. 122. The Court then directed the parties to submit briefing on certain issues that remained in dispute. These were (1) whether individual defendants Paone and Flynn are "employers" within the meaning of the FLSA and NYLL; (2) whether Defendants established that they had acted in subjective good faith with objectively reasonable grounds for believing that their actions with respect to Plaintiffs' compensation did not violate the FLSA or NYLL, which would relieve them of their obligation to pay Plaintiffs' liquidated damages; and (3) whether Plaintiffs had shown that Defendants' violations of the FLSA were willful, which would entitle Plaintiffs to a three-year (rather than two-year) statute of limitations on their FLSA claims.

This Memorandum and Order constitutes the Court's remaining Findings of Fact and Conclusions of Law pursuant to Federal Rule of Civil Procedure 52(a). The Court issues this opinion after carefully considering the testimony and other evidence introduced at trial, the arguments of counsel, and the parties' post-trial submissions, as well as the Court's own assessment of the credibility of the witnesses who testified.

For the reasons set forth below, the Court concludes that Defendants Paone and Flynn are not individual employers within the meaning of the FLSA or NYLL. The Court further finds that Defendants have failed to meet their burden to demonstrate that they acted in subjective good faith with objectively reasonable grounds for believing that their decision to classify and compensate the Plaintiffs as

"independent contractors" complied with the FLSA and the NYLL; accordingly, Plaintiffs are entitled to liquidated damages. On the other hand, the Court finds that Plaintiffs have not met their burden to show that Defendants' violations of the FLSA were "willful," as that term has been defined and applied by courts in this context. Thus, the FLSA's two-year statute of limitation applies.

In terms of damages, for those Plaintiffs whose claims were timely filed, the Court has calculated their unpaid overtime (based on findings of individual days worked and the average length of those workdays), the "tools of the trade" compensation they are due for the use of their own vehicles in furtherance of Defendants' business, and spread-of-hours premiums for those employees paid at the minimum wage. These damages are awarded after reviewing all of the parties' exhibits, assessing the credibility of witness testimony, and applying the same or similar formulas used by other courts to resolve such disputed issues.

The total damages awarded amount to $55,464.66 in compensatory damages, plus $55,464.66 in liquidated damages; the specific sums awarded to each Plaintiff are detailed in the Award of Damages Section, *infra*. As explained *infra*, this award ultimately represents a small portion of the total compensatory and liquidated damages that the individual Plaintiffs likely incurred during their work for Everlast, due to the fact that many of their reported claims fell outside the applicable statute

of limitations periods.  That is particularly so for the opt-in Plaintiffs, who could not assert NYLL claims in this FLSA collective action.[2]

The named Plaintiffs are also entitled to pre-judgment interest on their total awards of compensatory damages under the NYLL, and all Plaintiffs are entitled to post-judgment interest on their entire monetary awards.  Finally, having prevailed on the merits of their substantive FLSA and NYLL claims, Plaintiffs are entitled to attorney's fees and costs; that award will be determined after counsel's fee application has been filed and fully briefed.

## LEGAL STANDARD

Following a bench trial, "the court must find the facts specially and state its conclusions of law separately."  Fed. R. Civ. P. 52(a)(1).  Those findings and conclusions "may be stated on the record after the close of the evidence or may appear in an opinion or a memorandum of decision filed by the court."  *Id.*  "As the finder of fact in a bench trial, the Court is entitled to make credibility findings about the

---

[2] *See Lujan v. Cabana Mgmt., Inc.*, No. 10-CV-755 (ILG), 2011 WL 317984, at *9 (E.D.N.Y. Feb. 1, 2011) ("Although plaintiff also asserts New York Labor Law claims, . . . these claims may not be asserted as part of the [FLSA] section 216(b) collective action, but rather, under the Court's supplemental jurisdiction, would be the subject of a contemplated motion to certify a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure." (citing *Guzman v. VLM, Inc.*, No. 07-CV-1126 (JG) (RER), 2007 WL 2994278, at *5–6 (E.D.N.Y. Oct. 11, 2007)).  Plaintiffs never sought to certify a Rule 23 class.  *See* Pl. Mem. Supp. Mot. Certify FLSA Collective Action at 20, 23, ECF No. 26 (Oct. 13, 2022) (contrasting Plaintiff's proposed FLSA collective action with "a Rule 23 class action").  Although Plaintiffs originally pressed NYLL claims on behalf of the collective class, Plaintiffs abandoned these additional claims by the end of this litigation.  *Compare* Amended Compl. ¶¶ 72–78, ECF No. 41 (Nov. 28, 2022) (asserting NYLL claims "on behalf of [Plaintiffs], the FLSA Collective Plaintiffs and Class Members"), *with* Pl. Post-Trial Br. at 38, ECF No. 126 (Mar. 25, 2025) ("Opt-In Plaintiffs are asserting claims under the FLSA only.").

witnesses and testimony and to draw reasonable inferences from the evidence presented in reaching its factual findings." *Williams v. Bethel Springvale Nursing Home, Inc.*, No. 14-CV-09383 (NSR), 2018 WL 3344217, at *1 (S.D.N.Y. July 9, 2018) (citation modified).  However, to the extent that "a plaintiff's testimony is found to be inconsistent with corresponding facts submitted to the court or is otherwise not credible," the Court "must resolve the inconsistencies in favor of the defendant." *Caltenco v. G.H. Food Inc.*, No. 16-CV-1705 (VMS), 2019 WL 4784065, at *2 (E.D.N.Y. Sept. 30, 2019), *aff'd in part, vacated in part on other grounds*, 824 F. App'x 88 (2d Cir. 2020); *see also Aponte v. 5th Ave. Kings Fruit & Vegetables Corp.*, No. 20-CV-5625, 2022 WL 3655185, at *5 (E.D.N.Y. Aug. 25, 2022) (noting the same).

## FINDINGS OF FACT

These findings of fact are based on the parties' stipulated facts, trial testimony, and trial exhibits, including the revised exhibits filed with the parties' post-trial briefing.

### I.    Nature of Work

Everlast Sign & Service Inc. ("Everlast") is a company specializing in the delivery, installation, maintenance, and removal of real estate signage in New York City and Long Island.  Joint Pretrial Order ("JPTO"), Stipulations of Fact, ECF No. 107, Stipulated Fact A; Tr. dated Jan. 24, 2025 ("Jan. 24 Tr.") 175:7–25, ECF No. 128.[3]  Everlast was founded by Michael Tiefenworth (referred to at trial as "Michael"

---

[3] Everlast goes by several names including Everlast Service Company, Inc., Mikey T. Inc. (d/b/a Everlast Advertising), Everlast Service Inc. 2, All Island Signs,

or "Mike"), who died suddenly in May 2018. Tr. dated Jan. 23, 2025 ("Jan. 23 Tr.") 83:19–20, ECF No. 127. After his passing, his wife Anne Tiefenworth and his daughter Alexa Tiefenworth took over ownership and management of the business and continue to serve as co-owners and operators to this day. JPTO, Stipulated Facts J, KK; Jan. 23 Tr. at 115:14–15, 123:18–19. Individual Defendants Arthur Flynn and Lisa Paone have worked at Everlast for several decades (although, like Plaintiffs, they too have always been compensated as "independent contractors") and serve as, respectively, the company's Warehouse Manager and Office Manager. JPTO, Stipulated Fact L.; Jan. 23 Tr. at 24:13–15 (testimony of Paone that she was classified by Everlast as an independent contractor).[4]

Plaintiffs were installers employed by Everlast in manual positions that involved picking up real estate signs and posts from Everlast's warehouse, driving between designated houses to erect new signs and/or remove old ones, and bringing the removed and unused signs back to the warehouse. JPTO, Stipulated Fact C. Everlast's entire business is made up of the work of the installers. JPTO, Stipulated Fact U. At any given time, Everlast employed between eight and twelve installers. Jan. 23 Tr. at 23:25–24:3.

Defendants assigned the routes driven by each installer and had complete control over exactly which clients were served by exactly which installer, and which

---

LLC (d/b/a All Island Sign Company). JPTO, Stipulated Fact B. For purposes of this Opinion, they are collectively referred to as the singular "Everlast."

[4] Frank Paone was dismissed following the Court's oral ruling on the parties' cross-motions for summary judgment. *See* Minute Order dated Aug. 21, 2024.

territories were handled by each installer, but not over the order in which the installers serviced their routes.  JPTO, Stipulated Fact YY.  Most of the installers were assigned to particular areas of either Long Island or New York City as part of their designated routes.   Jan. 24 Tr. at 175:21–25.   Defendants instructed the installers to submit photos of the work they completed at each sign installation or removal so that Defendants could ensure that the job was properly completed.  JPTO, Stipulated Fact FF; Jan. 23 Tr. at 24:16–20; Jan 24 Tr. at 175:1–6.  Defendants gave the installers instructions regarding rules, regulations, and setbacks for client properties, and what they should do if they encountered any problems.   JPTO, Stipulated Facts MM, NN.

## II.    Roles of Individual Defendants

### A. Anne Tiefenworth

Anne was the wife of Michael Tiefenworth and became a co-owner of Everlast, along with her daughter Alexa, after her husband passed away in May 2018.  JPTO, Stipulated Facts J, KK; Jan. 23 Tr. at 115:14–15, 123:18–19.   Defendants do not dispute that Anne and Alexa Tiefenworth are both "employers" for purposes of this lawsuit.

Anne and Alexa both had the power to hire and fire installers.  Jan. 23 Tr. 119:8–10.  Anne considered herself to be a "passive owner" of Everlast and allowed Alexa to chiefly manage day to day operations, but Anne also admitted she had the power to determine how the company is operated and to hire and fire installers.  Jan. 24 Tr. at 161:5–24, 163:25–164:2.

### B. Alexa Tiefenworth

Alexa is the daughter of Michael Tiefenworth and became a co-owner of Everlast, along with her mother, at the age of 25 when her father passed away. JPTO, Stipulated Facts J, KK; Jan. 23 Tr. at 115:14–15, 123:18–19; Jan. 30 Tr. at 829:3–5. The highest level of education she received was her high school degree. Jan. 30 Tr. at 829:16–17. Before this lawsuit was filed, she had never heard of the FLSA. Jan. 30 Tr. at 829:22–24.

Alexa decided when Everlast needed new installers and was responsible for placing the job listings on Craigslist. Jan. 23 Tr. at 117:1–7. Like her mother, Alexa had the power to hire and fire installers. Jan. 23 Tr. at 119:8–10; Jan. 24 Tr. at 163:25–164:2. A limited number of installers were granted some paid vacation days due to their long tenure with the company, and Alexa decided who they were. JPTO, Stipulated Facts VV, XX. Although Anne and Lisa could determine how many days the installers worked, in practice, it was mostly Alexa who made those determinations. Jan. 23 Tr. at 25:24–26:6. Alexa also oversaw payroll, issued the checks, and assisted with IT. Jan. 23 Tr. at 25:8–10; Jan. 24 Tr. at 165:1–2.

### C. Lisa Paone

Lisa Paone is the sister of Everlast's late founder, Michael Tiefenworth. Jan. 23 Tr. at 39:3–5. At the time of trial, Lisa Paone had been working at Everlast for about 30 years. Jan. 23 Tr. at 24:11–12. She had "some college" background consisting of a "few credits." Tr. dated Jan. 27, 2025 ("Jan. 27 Tr.") 464:17–20, ECF No. 119.

9

Paone is the Office Manager of Everlast.  According to the installers, Paone "ran the office."  Jan. 27 Tr. at 396:8–10.  She answered the phone, took customer service requests from real estate agents, and handled complaints.  Jan. 27 Tr. at 396:11–15.  Paone usually got to the office at 9:30 a.m. and left by 5:00 p.m.  Jan. 23 Tr. at 100:24–101:2.  She was responsible for preparing and distributing Plaintiffs' 1099's.  JPTO, Stipulated Facts T, EEE.  Although Alexa placed the ads and decided when to hire installers, Paone alerted Alexa when more installers were needed.  Jan. 23 Tr. at 118:15–22.  Paone handled most of the process related to hiring installers and "primarily" determined which installers would be brought on by Everlast.  Jan. 24 Tr. at 168:18–20, 169:24–170:1.  Paone was present for "most" installers' interviews, with Alexa and Flynn also attending.  Jan. 23 Tr. at 104:13–18.

Each installer's day rate was determined by Michael Tiefenworth and, after his death, by Alexa and Anne Tiefenworth.  The day rate paid to each installer was then entered into a chart or "sheet" that Michael had originally created, and Paone applied those rates to determine each installer's pay.  Jan. 24 Tr. at 168:2–8. Although the decision to fire an installer was Anne and Alexa's, Paone would talk to them if there was an issue with an installer.  Jan. 24 Tr. at 181:16–20.

### D. Arthur Flynn

Arthur Flynn has worked for Everlast for over two decades.  At all times relevant to this lawsuit, he was Everlast's warehouse manager.  JPTO, Stipulated Fact P; Jan. 24 Tr. at 188:3–9.  He distributed the signs and other materials used by the installers for their work and determined where the installers' routes would be. JPTO, Stipulated Facts Q, R; Jan. 24 Tr. at 176:1–3.  Before Flynn became warehouse

manager, he worked at Everlast as an installer from 1999 through 2005. Jan. 24 Tr. at 202:11–12, 210:25–211:2. He could not hire or fire people, although he participated in some of the installers' interviews. Jan. 24 Tr. at 206:9–13, Jan. 23 Tr. at 104:13–18.

### III.    Hiring and Independent Contractor Agreements

Everlast posted its job listings for new installers on Craigslist. Jan. 23 Tr. at 116:22–25. The job listing described the position and specified that applicants must provide their own "cargo van" or similar vehicle to use on the job, but the parties agree that the listing did not indicate that it was for an "independent contractor" position. Jan. 27 Tr. at 356:8–15; JPTO, Stipulated Fact V. Instead, Defendants told Plaintiffs when they appeared for an initial interview that the positions were for independent contractors. JPTO, Stipulated Fact W. The job required no special skills or prior experience with sign installation. JPTO, Stipulated Fact O. Defendants trained installers by having each new installer drive with a veteran installer for one or two days (sometimes more) to observe how to work for Defendants. JPTO, Stipulated Fact OOO; Jan. 23 Tr. at 91:14–25.

The installer positions were long-term, and many installers kept their positions for years; indeed, Defendants have employed several installers for over five years, and three or four installers have worked for them for over ten years. JPTO, Stipulated Fact UU. The duration of each individual Plaintiff's time at Everlast varied from approximately three weeks to over ten years. JPTO, Stipulated Fact PPP.

Plaintiffs signed agreements drafted by Everlast specifying that they were independent contractors and that they would receive 1099's, not W2's. JPTO, Stipulated Facts D, H. The agreements were not changed after Michael passed away in 2018. Jan. 23 Tr. at 123:20–124:5. The installers had no opportunity to receive compensation for their work other than what Defendants chose to pay them, and installers' compensation did not fluctuate based on the financial success or failure of the Everlast. JPTO, Stipulated Fact OO.

While Plaintiffs were not barred from working for other companies, the parties have not identified any local businesses providing similar real estate sign services as Everlast. JPTO, Stipulated Fact TT.

## IV.    Everlast's Recordkeeping of Plaintiffs' Wages, Hours, and Days Worked

Each installer's pay was determined on a schedule or "sheet" created by Michael Tiefenworth. JPTO, Stipulated Fact KK; Jan. 23 Tr. at 120:25–121:3; Ex. 44.[5] At the time of trial, the sheet had not been changed since his passing, and Alexa still used it to determine each installer's rate. Jan. 23 Tr. at 121:4–11. Defendants solely determined each installer's compensation, without any negotiation with the installer. JPTO, Stipulated Fact HH. Plaintiffs were not given any documentation regarding their regular hourly rate or overtime rate. JPTO, Stipulated Fact X; Jan. 23 Tr. at 119:22–24. Plaintiffs were paid by the day, regardless of how many hours they worked, and were not paid overtime. JPTO, Stipulated Facts M, JJ. Defendants

---

[5] References to Ex. [Numbers] refer to exhibits produced by Plaintiffs at the Bench Trial.

did not keep track of the hours worked by the installers in the field, nor did they keep track of how long it took each installer to map their delivery routes. JPTO, Stipulated Facts Y, ZZ; Jan. 23 Tr. at 121:21–24.

Defendants maintained computerized records related to certain aspects of Plaintiffs' work for Everlast. According to Defendants, these internal records, called "daily count sheets," accurately tracked (1) each day that each of the Plaintiffs worked, and (2) the number of installations and/or removals that each Plaintiff performed on those days. JPTO, Stipulated Fact CC. The daily job count logs offered by Defendants were derived from Everlast's server and consist of records that were kept and maintained in the ordinary course of Everlast's business. JPTO, Stipulated Fact QQ. The daily job counts were automatically entered into the daily count sheets when the installer's assignments were scanned and given to the installers each day. Jan. 23 Tr. at 94:13–22; Jan. 30 Tr. at 833:13–834:20.

However, the extent to which these records represent an accurate and complete inventory of the dates each installer worked and "job counts" logged on each date was a disputed issue at trial. Defendants readily admitted that the daily count records were not "perfect." Jan. 23 Tr. at 94:6–8. Indeed, entries that reflected that an installer performed less than 10 jobs in a day or more than 45 or 50 jobs in a day were deemed to be an "error." Jan. 23 Tr. at 94:9–12, 94:23–25, 97:24–98:12. This was so because of Defendants' standard practice as to the minimum and maximum number of assignments per installer per day. Defendants would not have had an installer work on a given day if they did not have more than 10 installations or removals to

13

assign to that person, and it would generally not have been possible for an installer to complete 45 or more installations on a single day.

Defendants maintained copies of checks issued to Plaintiff.  JPTO, Stipulated Fact BB.  The checks were usually issued on Thursdays (unless the office was closed for a holiday) and would include Friday of the week before, Monday, Tuesday, Wednesday, and that Thursday.  Jan. 23 Tr. at 51:10–15.[6]  At trial, various Plaintiffs testified that the paycheck records did not accurately reflect the days that they worked because the records did not include certain dates, including but not limited to weekend shifts, on which they had worked.  However, Defendants claim that the installers did not complain about not getting paid for a day's work and argue that the payroll records should therefore be presumed accurate.  Jan. 24 Tr. at 209:15–18; *but see* Jan. 27 Tr. at 485:9–486:10 (testimony of opt-in Plaintiff Perez that there were numerous days he worked but for which he was not paid, that this happened the "majority of" the weeks he worked for Everlast, and that his complaints about underpayment were ignored).

## V.    Tools, Vehicles, and Mileage

As a condition of employment, Plaintiffs agreed to supply their own vehicles and some of their own tools, such as post hole diggers, breaker bars, channel locks, screwdrivers, and hammers.  JPTO, Stipulated Facts F, G; Jan. 24 Tr. at 206:21–25.  Everlast supplied the posts and signs that were to be installed, in addition to "S-hooks" that were used to hang the signs.  Jan. 24 Tr. at 173:2–174:4.  Everlast also

---

[6] There was at least one week when Plaintiffs were paid in cash.  Jan. 23 Tr. at 102:21–25.

provided a "wrecking bar," which was used to remove rocks from the ground before digging a hole to install a signpost.  Jan. 24 Tr. at 190:9–14.

Plaintiffs paid for their own fuel, repairs, and insurance for their vehicles. JPTO, Stipulated Fact G.  None of Plaintiffs maintained records of their time or mileage, and the numbers they provided in this litigation were estimates.  JPTO, Stipulated Fact EE.  Defendants did not keep track of Plaintiffs' mileage while they were performing their duties.  Jan. 23 Tr. at 130:8–10.

## VI.   Length of Plaintiffs' Workday

The length of each installer's workday was hotly contested at trial.

To begin, the parties dispute when the installers started their days.  There was no sign-in sheet or clock that installers used to clock in or out.  Jan. 24 Tr. at 200:5–10.  There is no dispute that Defendants had written policies that instructed the installers that the warehouse opened at 7:00 a.m. on Mondays and at 6:30 a.m. on Tuesday through Friday and that they should not enter or unload their trucks in the parking lot until the start time.  Jan. 23 Tr. at 88:8–23; Ex. 35.  However, Plaintiffs consistently testified, and the Court finds credible, that the policy was not enforced. Installers routinely unloaded their trucks from the previous day before the warehouse opened, which they were able to do because another employee was able to open the warehouse if they arrived before Flynn was there.  *See, e.g.*, Jan. 27 Tr. at 359:6–24.

The parties also dispute when the installers' workdays typically ended.  That dispute hinges on their starkly different contentions as to how long each assignment took to complete, and how long installers' routes typically required them to work on a given day (*e.g.*, the distance between assignments and traffic).  The average number

of assignments that an installer received in a day was 25 to 30.  Jan. 24 Tr. at 211:25–212:2.  Paone admitted that when she left the office at 5:00 p.m., she occasionally saw installers returning to the warehouse around that time.  Jan. 23 Tr. at 101:3–6.  Flynn claims that when he was an installer (and he had more assignments than the Plaintiffs), the latest he came back to the warehouse was 5:00 p.m., even after finishing 50 assignments; he claimed that he generally finished at 3:00 p.m. after finishing 40 assignments.  Jan. 24 Tr. at 218:11–15, 219:4–7.  According to Flynn, working after the sun came down was "frowned upon" and thus not common practice.  Jan. 24 Tr. at 219:10–21.  By contrast, Plaintiffs consistently testified that there was no such policy, and they "regularly" worked when it was dark, particularly in the winter when the sun went down earlier.  *See, e.g.*, Jan. 30 Tr. at 741:22–742:8, 744:4–6; Tr. dated Jan. 28, 2025 ("Jan. 28 Tr.") 544:21–23, ECF No. 120 (Pietrafesa testifying that he was "out there sometimes with a flashlight, 7:00 [p.m.]").

The parties agree that there were several factors that affected how long it took to do each installation, and in turn, how long it might take to complete the route for the day.  These included the individual installer's strength and skill level, the weather, the quality of the soil, and whether the soil was frozen.  Jan. 24 Tr. at 196:5–19; 231:5–10; Tr. dated Jan. 29, 2025 ("Jan. 29 Tr.") 743:8–14, ECF No. 121.  Flynn testified that an assignment typically took no more than five minutes to complete, but that a trickier installation could take ten minutes.  Jan. 24 Tr. at 214:21–22, 215:7–13.  However, the Plaintiff-installers testified that even a single assignment could take up to 30 minutes.  *See, e.g.*, Jan. 24 Tr. at 250:11–251:1 (testimony of

Kovalksy that one stop in a large property that did not allow large vehicles and required multiple installations took about 30 minutes and counted as one assignment). Flynn also testified that a removal typically took only one minute. Jan. 24 Tr. at 216:2–3.

In addition to the amount of time it took to do each assignment and complete a day's route, there were other responsibilities that took some installers more time than others. For example, Everlast had computers at its warehouse that the installers used to plan their routes each day, and the amount of time each installer took to plan his route on the warehouse computers differed from installer to installer, depending on their proficiency with the mapping programs that existed at the time, as well as factors like how many installers were waiting to use the limited computer terminals available. Jan. 24 Tr. at 194:15–22, 251:20–252:4. In addition, at times, installers had to call customers (*i.e.*, realtors and homeowners) to inquire about preferences and specifications for particular jobs. Jan. 24 Tr. at 202:13–21. Everlast did not track how many calls the installers had to take or how long those calls took. Jan. 24 Tr. at 202:22–24. Flynn claimed that the calls would take "a minute or so," but the installers described client communications that were at times more involved. Jan. 24 Tr. at 217:1–3; Jan. 27 Tr. at 384:13–385:3; Jan. 29 Tr. at 549:20–550:7.

## VII. Plaintiffs

Plaintiffs consist of three named Plaintiffs and fourteen opt-in Plaintiffs. The named Plaintiffs assert claims under the FLSA and NYLL, while the opt-in Plaintiffs assert claims only under the FLSA. Pl. Post-Trial Br. at 36 ("Pl. Mem."), ECF No.

126 (Mar. 25, 2025).[7]  Named Plaintiffs Frank Rafter, Tom Kelly, and Sefu Simms
and opt-in Plaintiffs Mark Corrado, John Kovalksy, Gerard Pietrafesa, and James
Perez testified at trial.

Below, the Court cites and summarizes relevant portions of the Plaintiffs' trial
testimony and, where in conflict, certain testimony by individual Defendants on those
issues.  The Court does not make factual findings in the subparts listed below except
as expressly indicated, but rather simply recites the various claims by the parties as
to the facts relevant to their claims for damages.  The Court's specific findings of fact
as to the measure of damages regarding overtime, unreimbursed expenses, and
related items are set forth generally in Part VIII of this Section and, for each
individual Plaintiff, in the Award of Damages Section, *infra*.

### A. Named Plaintiff Frank Rafter

The parties agree that Rafter began his work at Everlast on or about August
15, 2015; however, he contends that his last day at Everlast was on December 6, 2020,
while Defendants submit that he ceased work ten days earlier, on November 26, 2020.
Pl. Mem. at 36.  At some point during his time at Everlast, Rafter also worked as a
landscaper.  Jan. 24 Tr. at 208:18–19.  Rafter was hired by Michael Tiefenworth in
2004 and mostly worked with him until Michael passed away in 2018.  Jan. 29 Tr. at
646:6–7, 647:12–16.  Rafter claims he made $1,000 for a five-day workweek from 2015
to 2018 and $1,050 for a five-day workweek between 2015 and 2020.  Jan. 29 Tr.
662:8–13.  Rafter was one of the few installers who was eventually given paid

---

[7] References to the parties' briefs use ECF pagination.

vacation days as "a reward" for his years of service to Everlast. Jan. 24 Tr. at 185:21–23.

Like the other installers, Rafter did not keep track of the days he worked or the money he used for gas. Jan. 29 Tr. at 676:20. Rafter testified that he typically arrived at the warehouse around 5:00 a.m. in order to set up his vehicle, remove his old posts from the previous day, and prepare his new posts for the day. Jan. 29 Tr. at 656:21–647:4. He claims that management knew he was coming in at 5:00 a.m. Jan. 29 Tr. at 649:6–8. Rafter also came back to the warehouse at the end of the day to pick up his route for the next day, which Flynn described as a "voluntary" choice on Rafter's part. Jan. 24 Tr. at 227:20–24. Flynn claimed that Rafter typically finished his assignments around 4:00 p.m. Jan. 24 Tr. at 221:18–19. Yet Rafter claimed he typically finished at 5:00 p.m., for an average workday of twelve hours. Jan. 29 Tr. at 647:6–7.

Rafter testified that there was less installation and removal work in the winter months, and he accordingly received fewer assignments (around 20 to 25 per day), while in the warmer months, when Everlast was busier, he received 35 to 40 assignments per day. Jan. 29 Tr. at 650:2–8. He explained, however, that a smaller number of assignments did not always mean a correspondingly shorter workday. Jan. 29 Tr. at 650:24–651:13. Still, he testified that he would work an average of 7 to 8 hours a day in slower periods, while his workday was typically 12 to 14 hours a day during the busier parts of the year. Jan. 29 Tr. at 654:15–19. Similarly, in the winter he usually finished his day around 1:30 p.m. or 2:30 p.m., and 3:30 p.m. or

4:30 p.m. in the spring and summer.  Jan. 29 Tr. at 656:14–19.  He further testified that, on average, he drove about 85 miles a day in the slower months and around 125 miles a day in the busier months.  Jan. 29 Tr. at 654:2–10.  He estimated that he spent between $30 to $40 on gas per day on the days he worked.  Jan. 29 Tr. at 662:14–663:1.

### B. Named Plaintiff Tom Kelly

Kelly testified that he recalls having started at Everlast in March 2013.  Jan. 27 Tr. at 356:1–4.  In their post-trial submissions, however, the parties agree that Kelly worked at Everlast between August 15, 2015 and June 6, 2019.  Pl. Mem. at 37; Jan. 27 Tr. at 372:13–16.

At his initial job interview, he was told he would be hired as an independent contractor and that he would need to set up a business of his own so that he could be paid through it.  Jan. 27 Tr. at 357:16–20, 386:3–16.  When Kelly started, he was paid $200 per day; his day rate had increased slightly, to $210 per day, by the time he separated from employment.  Jan. 27 Tr. at 382:23–25.

Kelly would "drive in early to beat the traffic" and get to Everlast around 5:00 a.m. or 5:30 a.m.  Jan. 27 Tr. at 358:6–9.[8]  He testified that the rule that the warehouse opened at 7:00 a.m. on Monday and 6:30 a.m. on Tuesday through Friday was not enforced and that a painter named Billy usually opened the warehouse before Flynn arrived so that the installers could exchange their removed signs from the

---

[8] As noted *infra,* while the Court does credit that this was Kelly's typical time of arrival at the warehouse, it finds that the additional time Kelly spent at the warehouse in the early morning hours because of his desire to avoid traffic is not compensable.

previous day for the signs they had to install that day.  Jan. 27 Tr. at 359:6–24.  It took him approximately 35 or 45 minutes to unload his posts from the previous day, depending on the time of the year.  Jan. 27 Tr. at 360:8–13.  He also cleaned out and rearranged his van and loaded the buckets of dirt that he needed to use throughout the day to fill in post holes.  Jan. 27 Tr. at 404:9–14.

When he started at Everlast, Kelly used the warehouse computers to plan his route, but eventually ended up switching to an app on his phone because of how long it took to wait for the other installers at the company's computer.  Jan. 27 Tr. at 362:13–23.  It took him about 20 minutes to plan his route on both the computer and the phone app.  Jan. 27 Tr. at 363:8–14.  He usually left the warehouse between 8:30 a.m. and 9:00 a.m. to start his assignments for the day.  Jan. 27 Tr. at 360:14–21.  In this lawsuit, Kelly is claiming overtime in part because he alleges that he worked an average of three and a half hours per day before he left Everlast's warehouse to begin his installation routes.  Jan. 27 Tr. at 404:21–405:8.

In the spring, when Everlast was busiest, Kelly could have up to 25 to 30 assignments a day.  Jan. 27 Tr. at 361:9–12.  In the summer, when it was "slow," he had an estimated 22 assignments per day.  Jan. 27 Tr. at 361:19–22.  However, Kelly testified that a smaller number of assignments did not necessarily mean a shorter workday.  This was due to several factors, including the geographic spread of the jobs but especially traffic, since there was constant construction on Kelly's typical route.  Jan. 27 Tr. at 361:23–7.  Kelly testified that he drove around 125 miles a day.  Jan.

27 Tr. at 364:7–9.  He usually ate his lunch while driving between installations so that he could finish his assignments for the day.  Jan. 27 Tr. at 383:24–384:2.

Kelly testified that the time he finished varied throughout the years, but on "average" he ended his day at 6:00 p.m. or 6:30 p.m.  Jan. 27 Tr. at 371:11–18.  The latest he recalled ever finishing was at 9:00 p.m. on a day that he recalled having 46 assignments.  Jan. 23 Tr. at 13–20.  The earliest he recalled finishing was 4:00 p.m.  Jan. 27 Tr. at 406:4–7.  Flynn claimed that Kelly typically finished his assignments around 2:00 p.m., but that he sometimes finished around 4:00 p.m.  Jan. 24 Tr. at 221:15–19.

Kelly complained "a lot" to Paone and Flynn.  Jan. 27 Tr. at 372:25–373:5.  If he had complaints about his route or the signs, he would go to Flynn and if it was about his paystub he would go to Paone.  Jan. 27 Tr. 395:7–12.  He "constantly" asked Paone for a raise until he eventually received an additional $50 per week, though he wanted an additional $50 per day.  Jan. 27 Tr. at 372:25–373:16.  Whenever he asked for a raise, Paone told him in sum and substance that "she would have to talk to the powers that be."  Jan. 27 Tr. at 373:22–374:3.

In 2017 and early 2018, Kelly also worked as an Uber driver.  Jan. 24 Tr. at 226:9–10; Jan. 27 Tr. at 407:25–408:7.  He testified that he drove for Uber on the weekends and that there were no weeks where he worked a full week for Everlast and also drove for Uber.  Jan. 27 Tr. at 452:4–12.  However, he claims that he worked five-day weeks for Everlast in 2018 for all 52 weeks of that year, even though he was also driving for Uber for part of that year.  *See* Ex. 19.  In addition, both his tax

returns and Everlast's paystubs reflect that he was only paid $30,840 that year, not $52,000 (the amount he would have received if he worked 52 weeks at $1,000 per week). When he was confronted with this discrepancy at trial, he simply stated that he did not know if Everlast's records were accurate. Jan. 27 Tr. at 435:4–21.

### C. Named Plaintiff Sefu Simms

Simms claims he worked for Everlast from August 2019 until "approximately" October 16, 2020. Ex. 20; *see also* Jan. 29 Tr. at 736:9–10 (testifying that he "believe[s]" he stopped working at Everlast in October 2020). Defendants claim that Simms worked from August 18, 2019 through September 30, 2020, based on the daily count records. Ex. C-3.[9] Simms was compensated $900 per week the entire time he was at Everlast, although he testified that he was offered $1,000 per week when he interviewed. Jan. 29 Tr. at 734:12–21. Simms never did similar work with any company other than Everlast, nor has had he ever heard of companies doing similar work. Jan. 29 Tr. at 733:23–734:11.

Simms testified that he arrived at the Everlast warehouse between 6:15 and 6:30 a.m. and that "everyone always seemed to come at that time." Jan. 29 Tr. at 726:1–6, 727:8–13.[10] He said that he regularly unloaded the truck from the day's previous assignments and loaded the next day's assignments, which took 30 to 45

---

[9] References to Ex. [Letters] refer to exhibits produced by Defendants at the Bench Trial.

[10] Simms also testified that Flynn would arrive around that time as well. Jan. 29 Tr. at 726:12–13.

minutes.  Jan. 29 Tr. at 726:14–23.  He typically finished his day around 6:00 p.m. Jan. 29 Tr. at 730:12–14.

Simms testified that he had about 26 assignments a day on average; the most assignments he recalled having in a day was about 53 and the fewest was 23.  Jan. 29 Tr. at 727:14–20.  The amount of time it took him to route about 40 assignments was about 35 minutes.  Jan. 29 Tr. at 728:25–729:3.  He drove approximately 90 miles a day and used approximately 30 percent of his take-home pay to cover gas to use for his work.  Jan. 29 Tr. at 729:24–730:8.[11]  He completed his routes on the same day about "95 percent" of the time, and any assignments he did not finish rolled over to the next day.  Jan. 29 Tr. at 732:5–9.  Simms got food on the road and if he had a particularly "heavy load" of assignments, he ate while driving between assignments. Jan. 29 Tr. at 735:1–7.  The calls he made to customers, which he did about once a week, usually took 3 to 5 minutes, but at times could take up to 15 to 20 minutes. Jan. 29 Tr. at 735:12–20.

In this litigation, Simms claims that he drove 10,550 miles working for Everlast in 2019.  However, his corresponding tax returns list only 6,926 miles.  When confronted with this difference at trial, Simms testified that he was "not sure" which figure is more accurate.  Jan. 29 Tr. at 754:5–13.

### D. Opt-in Plaintiff Mark Corrado

The parties agree that Corrado worked at Everlast from August 2018 through January 2021.  Pl. Mem. at 41; Jan. 29 Tr. at 579:12–16.  He interviewed with Lisa,

---

[11] On occasion, Simms used Everlast's "gas card" to pay for gas.  However, that money was then deducted from his paycheck.  Jan. 29 Tr. at 741:18–21.

Anne, and Alexa. Jan. 29 Tr. at 578:2–7. When he started working for Everlast, he was paid $1,000 a week, or $200 a day, and after one year, it went up to $1,050 per week then $1,100 per week after another year. Jan. 29 Tr. at 585:21–25. Corrado did not do any similar work for any other company and did not know of any installer ever doing similar work for another company. Jan. 29 Tr. at 587:15–20.

The latest his workday started was 7:00 a.m., but he typically got there around 6:00 a.m. Jan. 29 Tr. at 580:13–18. He claims that the warehouse's official 7:00 a.m. start time "wasn't really something that was followed" and that "[g]uys were there as early as 5:30 a.m. on some days, and we definitely were able to start prior to that time." Jan. 29 Tr. at 581:17–23. Before the warehouse opened, he unloaded his truck from the previous day and collected his sheets to begin routing his day, all of which took about 45 minutes. Jan. 29 Tr. at 582:1–22. Corrado typically received 30 assignments each day. Jan. 29 Tr. at 583:12–14. Corrado's workday typically ended around 6:00 p.m. Jan. 29 Tr. at 584:19–20.

In his first year, his routes were concentrated in both Suffolk and Nassau Counties, and he drove around 100 miles a day. But towards the end of his tenure, his routes were concentrated primarily around Montauk and the Hamptons, and he was driving around 160 miles a day. Jan. 29 Tr. at 583:4–9, 584:9–10. He ate meals in his truck on his way to the next stop, "to minimize time, to prevent delays along [his] route to make sure stops were getting done." Jan. 29 Tr. at 587:24–588:4. Although Corrado claimed in his interrogatory responses that he worked either five or six days a week during his entire time at Everlast, *see* Ex. 29, he agreed at trial

that he sometimes worked four days per week. Jan. 29 Tr. at 607:3–4. In addition, he agreed that the $600 paychecks he received accurately corresponded to certain weeks in which he only worked three days (that is, they accurately reflected $200 per day for three days of work). He also agreed that if he had ever not received pay for a day he worked, he would have complained about it, and he never did. Jan. 29 Tr. at 608:3–10. He did not keep his own records of the days that he worked. Jan. 29 Tr. at 618:19–21.

Corrado also performed work for Everlast outside of his duties as an installer, helping Flynn or taking over certain responsibilities when Flynn was not there by setting up routes for the installers and pulling sings that they needed for the next day. Jan. 23 Tr. at 89:1–15. He received separate compensation for that work, *see* Jan. 23 Tr. 89:23–25, although at times, the amounts were combined in one paycheck. Jan. 29 Tr. at 610:1–611:7, 615:4–8.

### E. Opt-in Plaintiff John Kovalsky

Kovalsky claims that he worked for Everlast from May 23, 2019 through November 2019, and two weeks in July 2020, consisting of 26 five-day weeks and 5 six-day weeks. Pl. Mem. at 41. Defendants contend that their payroll records demonstrate that he only worked 27 weeks, including 2 one-day weeks, 6 three-day weeks, and 3 four-day weeks. Def. Post-Trial Submission at 20 ("Def. Mem."), ECF No. 124 (Mar. 24, 2025) (citing Exs. Q-2, Q-3). When he was asked at trial whether it was possible he worked two-day weeks or any one-day weeks, he answered "perhaps" and said he could "not answer honestly" because it was five years ago; he later said that he recalled working four-day weeks and a three-day week "once." Jan.

24 Tr. at 286:21–287:21; Jan. 27 Tr. at 326:4–18.  He also said that the workdays listed in the interrogatory responses prepared by his counsel based on their consultations were an "approximation."  Jan. 27 Tr. at 324:21–24.

Kovalsky does not claim that he was not paid for days he worked.  Jan. 24 Tr. at 288:8–10; Jan. 27 Tr. at 334:23–25.  He was paid a rate of $180 per day.  Jan. 24 Tr. at 259:18–20.  Kovalsky has never done installing for any other company and has never heard of any other installer working for a different company.  Jan. 24 Tr. at 259:11–17.

Kovalsky typically arrived at the warehouse between 6:30 a.m. and 7:00 a.m., and if Flynn was not there when he arrived, he unloaded and cleaned his vehicle from the day before.  Jan. 24 Tr. at 243:15–244:3, Jan. 27 Tr. at 346:17–24.  The rule that the warehouse opened at 6:30 a.m. on Monday and 7:00 a.m. on Tuesday through Friday was not always enforced, and he was told to get there as early as he could and was given permission to start unloading his truck before Flynn arrived.  Jan. 24 Tr. at 246:1–13.  When he arrived at 6:30 a.m. or 7:00 a.m., other installers were already there.  Jan. 24 Tr. at 247:12–18.  It took Kovalsky approximately 45 minutes to finish unloading his truck, receiving his assignments, and mapping out his route.  Jan. 24 Tr. at 247:21–248:14.

Kovalsky estimated that he had an average of 30 to 35 assignment in a day, with a minimum of 25 assignments in a day, and a maximum of 46 assignments in a day, although fewer assignments did not always translate to a shorter workday.  Jan. 23 Tr. at 3–24.  For example, one stop in a large property that did not allow large

vehicles and required multiple installations might take 30 minutes and yet still counted as 1 assignment. Jan. 24 Tr. at 250:11–251:1. On a "good day," his routes took about 8 hours, but at other times he had a 10-hour day; he estimated he had a 10-hour day almost every other week. Jan. 24 Tr. at 253:5–11. He typically ended his day around 5:30 p.m. or 6:00 p.m. and drove about 150 miles a day. Jan. 24 Tr. at 253:12–15. During his time at Everlast, he worked on assignments after dark, "four, five times." Jan. 27 Tr. at 337:24–338:6. He estimated that he spent about one-third to one-half of his pay on fuel for his routes. Jan. 24 Tr. at 262:22–263:1.

If Kovalsky had any complaints related to his payroll, including his payrate, he raised those issues with Paone. Jan. 24 Tr. at 255:9–13, 269:21–270:3. It was his understanding that Paone and Flynn sent a recommendation to Anne and Alexa for their approval. Jan. 24 Tr. at 256:11–17. If he had issues with his assignments, he went to Flynn. Jan. 24 Tr. at 255:9–13. For example, if a realtor wanted an assignment done in a particular way that was not practical, he reached out to Flynn if he could not contact the realtor directly. Jan. 24 Tr. at 255:14–21.

The Court also heard testimony related to a challenge by Defendants to Kovalsky's credibility. Shortly before Kovalsky started working at Everlast, he was arrested for arson in the third degree. Jan. 24 Tr. at 241:22–24. When he was asked at trial about the circumstances of the arrest, he acknowledged responsibility for that act but explained that he has bipolar disorder and at the time, he was not taking his medication nor attending his therapeutic treatments, which led to a manic episode. Jan. 24 Tr. at 242:1–6. At the time of his arrest, he was working as a paramedic and

was a volunteer firefighter. Jan. 24 Tr. at 242:17–243:2, 264:8–11. Kovalsky was not able to continue in those positions while his criminal case was pending and was "desperate" for another job when he answered Everlast's ad for an installer. Jan. 24 Tr. at 242:17–243:5. Kovalsky worked at Everlast while his criminal charges were pending; ultimately, he was convicted and was sentenced to two years in prison. Jan. 24 Tr. at 264:2–5.

Kovalsky testified that since his arrest and conviction on the arson charge, he has been fully compliant with treatment for his bipolar disorder and has not been arrested again. Jan. 24 Tr. at 242:6–16. Presently, Kovalsky works as an operations supervisor for a transit company. Jan. 24 Tr. at 281:24–282:3.

Rather than support Defendants' attack on Kovalsky's credibility, the Court finds that this testimony only strengthened it. He was candid, measured, and forthright when discussing his personal history and mental health challenges; he did not deflect or shy away from taking responsibility for his prior non-compliance with treatment and the serious crime he committed while off his medication. The Court found credible his testimony that he has been fully compliant with treatment and has been a law-abiding citizen since his arrest. If anything, what Kovalsky credibly described as the "desperate" economic position he found himself in while those charges were pending only strengthens his claim that he had little to no ability to negotiate when he was required by Everlast to work overtime for no extra pay and to cover his own work-related expenses as a condition of his employment.

### F. Opt-in Plaintiff Gerard Pietrafesa

Pietrafesa claims that he worked for Everlast from June 2018 through June 2019, including a total of 45 five-day weeks. Pl. Mem. at 42; Ex. 33. Defendants contend that their payroll records demonstrate that he only worked a total of 31 weeks, 22 of which were five-day weeks. Def. Mem. at 23 (citing Ex. E-1). When confronted with this discrepancy at trial, he said it may be "possible" that he worked some four-day weeks, but that he does not remember ever working three-day weeks. Jan. 28 Tr. at 564:24–565:3. He was hired after he responded to an ad on Craigslist and interviewed with Flynn. Jan. 28 Tr. at 535:24–536:18. He was paid a rate of $950 per week. Jan. 28 Tr. at 561:11–25. He does not claim he was not paid for a day's work. Jan. 28 Tr. at 562:3–5.

Pietrafesa would "generally" arrive at the warehouse at 6:00 a.m. Jan. 28 Tr. at 538:15–17. He testified that, before Flynn arrived at the warehouse, a painter named Billy would open the warehouse, and the installers would unload their trucks and get prepared, so they were ready by the time Flynn arrived. Jan. 28 Tr. at 539:4–20. It would take him 15 minutes to unload his truck and 15 minutes to load it. Jan. 28 Tr. at 540:2–7. It would take him about 20 minutes to plan his route, unless he had to wait longer to use the computers. Jan. 28 Tr. at 541:11–23.

Pietrafesa would have between 25 and 32 assignments a day. Jan. 28 Tr. at 540:14–19. Sometimes he would get additional assignments while he was out in the road, such as when Flynn would call him saying that they needed a sign taken down right away or if Pietrafesa put a sign in the wrong spot and needed to correct it. Jan. 28 Tr. at 542:13–22. He usually drove "anywhere from 100 to 125 miles a day." Jan.

30

28 Tr. at 542:23–24.  He testified that he would usually start his routes an hour after arriving to the warehouse and that his assignments would take "probably 11 hours." Jan. 28 Tr. at 542:25–543:20.  Pietrafesa, like the other installers, would eat his lunch while he was driving between assignments "because you really didn't have enough time to stop and take lunch" and "[i]f you took a half hour that means your day would be a half hour longer."  Jan. 28 Tr. at 547:17–22.

He testified that he usually finished between 5:00 p.m. and 6:00 p.m., and that "once in a while" he would finish at 4:00 p.m. or 3:00 p.m.  Jan. 28 Tr. at 542:25–543:20.  In the winter, Pietrafesa worked after the sun came down "one or two days a week."  Jan. 28 Tr. at 562:6–563:3.  Flynn claimed that Pietrafesa finished his assignments around 2:00 p.m., but that he would sometimes finish around 3:00 p.m. or 4:00 p.m.  Jan. 24 Tr. at 221:13–17; 221:25–222:7.

Like Kovalsky, Pietrofesa also has a criminal conviction, albeit one that predated his time at Everlast by nearly three decades; he was convicted of a crime involving stolen travelers checks in 1989.  Jan. 28 Tr. at 550–52.

### G. Opt-in Plaintiff James Perez

Prior to trial, Perez claimed that he worked at Everlast from February 2019 to September 2019, for a total of 26 five-day weeks and 8 six-day weeks.  Ex. 30. Defendants contend that their payroll records demonstrate that he only worked a total of 18 weeks, 8 of which were five-day weeks, and that he worked no six-day weeks.  Def. Mem. at 21 (citing Exs. G-3, G-4).  He was paid $950 a week, or $190 per day worked.  Jan. 27 Tr. at 495:13–496:8.  At trial, Defendants asked Perez if it was possible that he worked three-day weeks at times and he responded, "could be."  Jan.

27 Tr. at 496:13–16.  He agreed that he sometimes worked four-day weeks.  Jan. 27 Tr. at 497:3–5.  When Defendants showed Perez the form he signed on his first day, dated October 10, 2019, Perez could not explain how it was possible to have worked 34 weeks in calendar year 2019 with an October start date.  Jan. 27 Tr. at 498:24–501:3.

In Plaintiffs' post-trial submission, Perez revised the spreadsheet that was attached to his interrogatory responses, and is now seeking damages for overtime between October 10, 2019 and February 13, 2020, including what he contends were 18 five-day weeks and 4 six-day weeks.  Pl. Post-Trial Br. Attach. 2 ("Pl. Mem. Attach. 2"), ECF No. 126-2 (Mar. 25, 2025) (Perez revised spreadsheet).

Perez discovered Everlast through an ad on Craigslist.  Jan. 27 Tr. at 466:15–17.  He interviewed with Flynn and another individual within a day or two after responding to the ad.  Jan. 27 Tr. at 467:1–15.  He was told he would be hired as an independent contractor and would need to file a 1099 tax form, which he had never done before.  Jan. 27 Tr. at 469:2–11.  He was paid a rate of $950 per week for a five-day week, which was prorated if he worked fewer days in a given week.  Jan. 27 Tr. at 482:4–5.

Perez arrived before the warehouse opened at 6:00 a.m. and testified that, upon arrival, he usually saw a line of installers' cars waiting for their assignments.  Jan. 27 Tr. 474:1–6.  After getting ready for the assignments and mapping his route, he started driving by 7:00 a.m. or 7:30 a.m.  Jan. 27 Tr. at 472:19–473:4, 474:7–10, 514:13–14.  His estimate of the daily job count differed from most other plaintiffs': he

recalled that he usually had 17 to 20 assignments, with 10 being the least and 20 the most, and with his route ranging anywhere from Locust Valley to east Long Island. Jan. 27 Tr. at 475:2–10.  It usually took him about 30 minutes to arrive at his first assignment.  Jan. 27 Tr. at 478:11–13.  An average assignment took him 20 to 30 minutes to complete.  Jan. 27 Tr. at 488:18–20.  The weather, conditions of the soil, and traffic could make his workday longer.  Jan. 27 Tr. at 475:17–476:7.  Removals were quicker, as "you just loosen it and you rock it back and forth, and then you yank it out of the dirt."  Jan. 27 Tr. at 488:21–489:1.  Perez usually ate his lunch while driving between assignments.  Jan. 27 Tr. at 479:18–22.

On average, he drove 120 miles a day on his assignments.  Jan. 27 Tr. at 478:25–479:1.  Perez spent approximately 20 or 30 percent of his pay on gasoline. Jan. 27 Tr. at 483:5–14.  At one point, Perez had to pay $1,200 to fix his vehicle after his tire blew out while he was working, which knocked out his hose and "sent [his] anti-freeze everywhere."  Jan. 27 Tr. at 483:15–22.  Everlast did not reimburse him for those repairs.  Jan. 27 Tr. at 483:23–25.

At trial, Perez claimed that there were days he was not paid, that this happened the "majority of" the weeks he worked, and that his complaints were ignored.  Jan. 27 Tr. at 484:9–485:10.  However, he did not seek any damages for unpaid days in either his original interrogatory responses or in his revised post-trial spreadsheet.  Ex. 30 (interrogatories); Pl. Mem. Attach. 2 (revised spreadsheet).

## VIII. Findings of Fact: Days Worked and Start and End Dates

As a general matter, the Court finds that the Plaintiffs were highly credible in their testimony about the nature of the work they performed at Everlast, the

conditions of the work, how long the routes took and certain factors that contributed to longer workdays (such as traffic, weather complex or difficult assignments, client needs, and the distance between installations along the route). Among other things, the Court bases this finding upon their observed demeanor on the witness stand over multiple days of trial, as well as the general consistency in their accounts of the work they performed and the details of what those assignments involved, particularly during the company's busy seasons in warmer months. *See, e.g., Weng v. New Shanghai Deluxe Corp*, No. 19 Civ. 9596 (ER), 2022 WL 5434997, at *4 (S.D.N.Y. Oct. 7, 2022) ("In assessing witness credibility, a trial court's findings of fact may be based on, among other things, the demeanor of the witnesses." (internal quotation marks omitted)). The Court also credits Plaintiffs' testimony that the demands of the work required them to arrive early at the warehouse to obtain their materials, unload signs from the day before, and map their routes, and that Everlast's "policy" regarding a 7:00 arrival was not followed in practice.

On the other hand, while the Court finds that Plaintiffs were generally credible in their testimony that their workdays frequently exceeded 8 hours and often extended to between 10 and 12 hours, the Court has greater difficulty crediting their testimony as to the number of days they worked in a given week. This is so for several reasons. First, unlike the length of their workdays, Defendants did maintain some contemporaneous records of installers' daily job count records. Although these count records did not, by Defendants' own omission, track with absolute accuracy the total number of assignments each installer covered in a given workday, they do provide at

least some contemporaneous records of *whether* a Plaintiff worked on a particular day at all.  Similarly, some Plaintiffs claim that they worked five days for a particular number of weeks per year; however, Defendants' pay records show that they were in fact paid for four-day or three-day weeks during these periods.  The Court reaches this conclusion by taking these installers' agreed-upon day rates and dividing certain weekly paychecks by that amount to arrive at three or four days of pay. Additionally, though some Plaintiffs testified there were days they were not paid, no Plaintiffs here seek damages for entire days worked for which they claimed they were not paid.

In addition, some Plaintiffs initially claimed to have worked for periods of time that appear nowhere in Defendants' daily job count or payroll records.  For example, at the time of trial, Perez claimed that he worked at Everlast from February 2019 to September 2019, with a total of 26 five-day weeks and 8 six-day weeks.  Ex. 30.  But when Defendants' showed Perez the form he signed on his first day that was dated October 10, 2019, Perez could not explain how it was possible to have worked 34 weeks in calendar year 2019 with an October start date.  Jan. 27 Tr. at 498:24–501:3. In Plaintiffs' post-trial submission, Perez revised the spreadsheet that was attached to his interrogatory responses and is now seeking damages for overtime only between October 10, 2019 and February 13, 2020, including 18 five-day weeks and 4 six-day weeks.  Pl. Mem. Attach. 2.  This concession, while appropriate, gives the Court pause about crediting either Perez's or the other Plaintiffs' recollections and approximations as to the specific weeks worked or days worked within those weeks where those recollections conflict with the (albeit imperfect) contemporaneous records Defendants

35

maintained.  Moreover, for the Plaintiffs who did not testify at trial, the Court does not have the benefit of their testimony or cross-examination and only has their interrogatory responses, which — except for Rafter and Perez — Plaintiffs have not revised, even after Defendants submitted documents contradicting Plaintiffs' asserted start and end dates.

In addition, Plaintiffs' written estimates of the weeks they worked and number of days worked in those weeks do not account for seasonal changes, even though they testified that they received fewer assignments, or when Everlast had a decline in business during the beginning of the COVID-19 pandemic.  *See, e.g.* Jan. 29 Tr. at 650:2–8 (testimony of Rafter that he received 20 to 25 assignments per day in the winter months and 35 to 40 assignment in the warmer months); Jan. 29 Tr. at 748:15–18 (testimony of Simms that, during the beginning of the COVID-19 pandemic in 2020, he worked "substantially less").

As such, the Court resolves the daily-hours-worked dispute in Plaintiffs' favor — which entitles certain Plaintiffs to overtime pay — but will rely on Defendants' contemporaneous records to determine the dates that each Plaintiff worked at Everlast.  Specifically, the Court credits that Plaintiffs regularly worked overtime (*i.e.*, more than 40 hours) in (1) the weeks they worked five or more days throughout the year and (2) the weeks they worked four days during busy months.  Further, as discussed *infra*, the Court will credit Plaintiffs' reasonable estimates as to the typical hours worked per day during the days they conducted sign installations and removals for Everlast.

36

However, the Court will rely on the daily count sheets maintained by Defendants to determine the specific dates each Plaintiff worked. *See Aponte v. 5th Ave. Kings Fruit & Vegetables Corp.*, No. 20-CV-5625, 2022 WL 3655185, at *6 (E.D.N.Y. Aug. 25, 2022) ("Although plaintiff testified that he regularly worked 60 hours per week, the documentary evidence proffered by plaintiff undermines his estimate of the number of hours that he worked."); *Haifeng Xie v. Sakura Kai I Inc.*, 17-CV-7509 (ILG) (JO), 2019 WL 1568756, at *6–7 (E.D.N.Y. Apr. 11, 2019) (rejecting plaintiff's testimony that, for a portion of plaintiff's tenure, was contradicted by written work schedules); *Caltenco v. G.H. Food Inc.*, No. 16-CV-1705 (VMS), 2019 WL 4784065, at *7 (E.D.N.Y. Sept. 30, 2019), *aff'd in part, vacated in part on other grounds,* 824 F. App'x 88 (2d Cir. 2020) ("Although Plaintiff testified at trial that he began working for Defendants on February 2007 or 2008 (and at his deposition, 2009), neither the contemporaneous wage records nor other evidence introduced at trial supports that contention."); *Gallego v. Adyar Ananda Bhavean Corp.*, 16-CV-4631 (AJN), 2018 WL 4735710, at *6 (S.D.N.Y. Sept. 30, 2018) (crediting defendant's records over plaintiff's "vague recollections of hours worked and pay received").

The Court is satisfied with testimony at trial that daily count entries with a single job are likely the result of human or computer error. *See, e.g.*, Jan. 23 Tr. at 94:6–22 (describing the process by which data is inputted into the daily count sheets). However, the record contains evidence of some days reflected in the daily count sheets with single-digit job counts higher than one being paid out as workdays. *Compare* Ex. O-2 (daily count sheets for opt-in plaintiff Tije reflecting daily counts of six, five,

and twenty-three on April 2, 2021; April 6, 2021; and April 7, 2021, respectively), *with* Ex. O-3 (payroll records for Tije reflecting payment for three workdays on April 8, 2021 for the pay period between April 2 and April 8, 2021). Accordingly, in evaluating the daily count records, the Court will not treat days with job counts of one as workdays but will deem days with single-digit job counts higher than one as workdays.

The Court will similarly credit the daily count records and Defendants' payroll records over Plaintiffs' own recollections to the extent there are disputes related to individual Plaintiffs' start and end dates. The Court's additional findings of fact and conclusions of law, including damages calculations, that flow from these determinations are discussed below.

## CONCLUSIONS OF LAW

### I.    Overtime Violations

Under the FLSA "an employer must pay an employee who has worked more than forty hours during a workweek 'at a rate not less than one and one-half times the regular rate at which he is employed' for those excess hours." *Chen v. L & H Wine & Liquor, Inc.*, No. 19-CV-6115 (PGG), 2024 WL 1932855, at *6 (S.D.N.Y. May 2, 2024) (quoting 29 U.S.C. § 207(a)(1)). New York law similarly requires that employees pay overtime as part of the full amount of wages owed. *See* 12 N.Y.C.R.R. § 142-2.2 (an employer shall pay an employee for overtime at a wage rate of one and one-half the employee's regular rate "in the manner and methods provided in . . . the Fair Labor Standards Act"); *Chun Jie Yin v. Kim*, No. 07-CV-1236 (DLI) (JO), 2008 WL 906736, at *4 (E.D.N.Y. Apr. 1, 2008) (adopting report and recommendation) ("[A]

plaintiff who prevails on a cause of action under the state law is entitled to the full amount of wages owed, not just the statutory minimum wage for the hours worked.").

## A. The Court Will Rely on Plaintiffs' Credible Estimates of the Hours Worked in a Typical Day

Under the FLSA, employers must maintain accurate records of the hours and wages of their employees. *See* 29 U.S.C. § 211(c) (requiring every employer to "make, keep, and preserve such records of the persons employed by him and of the wages, hours, and other conditions and practices of employment maintained by him"); 29 C.F.R. § 516.2(a)(7) (requiring that employers maintain records of "[h]ours worked each workday and total hours worked each workweek" by employees). As courts have observed, "[t]hese requirements are not mere technicalities, but substantive obligations that are fundamental underpinnings of the FLSA and critical to ensuring the statute's effectiveness, for an employer's failure to keep accurate records can obscure a multitude of minimum wage and overtime violations." *Amaya v. Superior Tile & Granite Corp.*, No. 10-CV-4525 (PGG), 2012 WL 130425, at *6 (S.D.N.Y. Jan. 17, 2012) (citation modified).

New York State law has similar record keeping requirements for employers. *Gonzalez v. Dom's Lawnmaker, Inc.*, No. 17-CV-3519 (JMA) (SIL), 2022 WL 17488524, at *2 (E.D.N.Y. Dec. 7, 2022) (citing NYLL § 661 (requiring employers to establish and maintain payroll records "showing for each week worked the hours worked, the rate or rates of pay and basis thereof") and 12 N.Y.C.R.R. § 142-2.6(a)(4) (requiring employers to establish, maintain and preserve, for not less than six years, weekly payroll records which show for each employee "the number of hours worked

daily and weekly, including the time of arrival and departure for each employee working a split shift or spread of hours exceeding 10")); *see also Amaya,* 2012 WL 130425, at *6 (explaining requirements under FLSA and noting that "New York law imposes similar record-keeping obligations").

Although "[a]n employee seeking to recover unpaid wages has the burden of proving that he performed work for which he was not properly compensated," *Java v. El Aguila Bar Rest. Corp.*, No. 16-CV-6691 (JLC), 2018 WL 1953186, at *2 (S.D.N.Y. Apr. 25, 2018) (citation modified), "[w]here an employer's payroll records are inaccurate or incomplete, courts apply a burden-shifting scheme to determine whether an employee has established that he was underpaid, and what damages he suffered." *Williams v. Bethel Springvale Nursing Home, Inc.*, No. 14-CV-09383 (NSR), 2018 WL 3344217, at *6 (S.D.N.Y. July 9, 2018) (citation modified).  In such circumstances, "an employee has carried out his burden if he proves that he has in fact performed work for which he was improperly compensated and if he produces sufficient evidence to show the amount and extent of that work as a matter of just and reasonable inference."  *Id.* (quoting *Kuebel v. Black & Decker Inc.*, 643 F.3d 352, 362 (2d Cir. 2011)).  To be sure, "[t]he Second Circuit has noted that this burden 'is not high' and may be satisfied through an employee's 'estimates based on his own recollection.'"  *Id.* (quoting *Kuebel*, 643 F.3d at 362); *see also Gonzalez*, 2022 WL 17488524, at *2 (noting that "a plaintiff can meet this burden by relying on recollection alone" (citation modified)).  However, there must be "'at least some credible evidence that plaintiff performed' the allegedly uncompensated work."

*Juarez-Cardoso v. La Flor de Santa Ines, Inc.*, No. 15-CV-6671 (VMS), 2017 WL 4357009, at *13 (E.D.N.Y. Sept. 29, 2017) (quoting *Daniels v. 1710 Realty LLC*, 497 F. App'x 137, 139 (2d Cir. 2012) (summary order)).

The Supreme Court introduced this burden-shifting framework almost 80 years ago in *Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680, 687 (1946).  As the Second Circuit recently explained:

> The Supreme Court held in 1946 that when an employer's records are "inaccurate or inadequate" and thereby prevent an employee from "prov[ing] the precise extent of uncompensated work," it is enough "if [the employee] proves that he has in fact performed work for which he was improperly compensated and if he produces sufficient evidence to show the amount and extent of that work as a matter of just and reasonable inference." *Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680, 687 (1946). So long as "[t]he uncertainty lies only in the amount of damages arising from the statutory violation," "[i]t is enough . . . if there is a basis for a reasonable inference as to the extent of the damages." *Id.* at 688.  This rule is rooted in fundamental fairness: "[T]he employer, having received the benefits of such work, cannot object to the payment for the work on the most accurate basis possible under the circumstances." *Id.*

*Perry v. City of New York*, 78 F.4th 502, 526 (2d Cir. 2023).  And under New York law, "a similar standard to *Anderson* is applied in deciding overtime claims" where courts are called upon to resolve factual disputes regarding an employee's days and hours worked.  *Gonzalez*, 2022 WL 17488524, at *2 (collecting cases).

However, "[a]lthough a plaintiff's testimony regarding his recollection alone may be sufficient to establish a rebuttable presumption that he worked certain hours for which he was not compensated, such testimony only establishes such a presumption if the testimony is credible."  *Java*, 2018 WL 1953186, at *2 (quoting *Romero v. Rung Charoen Sub, Inc.*, No. 16-CV-1239 (VMS), 2017 WL 4480758, at *4

(E.D.N.Y. Sept. 30, 2017)).  Indeed, "[i]t is within the province of the district court as the trier of fact to decide whose testimony should be credited.  And as trier of fact, the judge is entitled, just as a jury would be, to believe some parts and disbelieve other parts of the testimony of any given witness."  *Id.* (quoting *Krist v. Kolombos Rest. Inc.*, 688 F.3d 89, 95 (2d Cir. 2012)).

If an employee credibly makes this initial showing, "[t]he burden then shifts to the employer to come forward with evidence of the precise amount of work performed or with evidence to negative the reasonableness of the inference to be drawn from the employee's evidence."  *Williams*, 2018 WL 3344217, at *7 (quoting *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 456 (2016)).  "If the employer fails to produce such evidence, the court may then award damages to the employee, even though the result be only approximate."  *Kuebel*, 643 F.3d at 362 (quoting *Anderson*, 328 U.S. at 688).

However, "the NYLL — unlike the FLSA — does not permit an employer to discharge this burden by undermining the reasonableness of an employee's evidence that he was underpaid."  *Gamero v. Koodo Sushi Corp.*, 272 F. Supp. 3d 481, 498 (S.D.N.Y. 2017), *aff'd*, 752 F. App'x 33 (2d Cir. 2018).  "The NYLL is more demanding: An employer must demonstrate that it in fact paid its employees "wages, benefits, and supplements."  *Id.* (quoting NYLL § 196-a(a)).  "And if an employer cannot satisfy its burden under the FLSA, it cannot satisfy this more demanding burden of the NYLL."  *Id.* (citation modified).

Accordingly, as discussed *supra*, the Court credits that Plaintiffs regularly worked overtime (*i.e.*, more than 40 hours) in (1) the weeks they worked five or more

days throughout the year and (2) the weeks they worked four days during busy months. The Court will credit the Plaintiffs' reasonable estimates as to the typical hours worked per day during the days they conducted sign installations and removals for Everlast and will rely on that testimony to calculate whether the individual plaintiffs are entitled to overtime pay. The Court does so based on an average number of hours worked per day per installer during different periods of the calendar year in which conditions and workload typically varied. Specifically, taking into account the time required to prepare for their routes each morning, complete their routes during the day, and return to the warehouse at the end of the day, the Court finds that, on average, the installers worked (1) 11 hours per day in the busier months of the year (March through October), typically beginning their day at 6:30 a.m. and concluding at approximately 5:30 p.m.; and (2) 9.5 hours per day in the slower months (November through February). *See, e.g.*, *Chen v. L & H Wine & Liquor, Inc.*, No. 19-CV-6115 (PGG) , 2024 WL 1932855, at *6 (S.D.N.Y. May 2, 2024) (approximating the amount of hours plaintiff worked as a matter of the court's "reasonable inference" based on average number of hours plaintiff claimed he worked); *Chen v. Hunan Manor Enter., Inc.*, No. 17-CV-802 (GBD) (GWG), 2023 WL 5574854, at *4 (S.D.N.Y. Aug. 29, 2023), *amended on reconsideration in part*, 2023 WL 8434700 (S.D.N.Y. Dec. 5, 2023) ("Because Defendants failed to maintain adequate employment records, this Court relies on available documents in evidence and credible trial testimony in order to approximate Plaintiffs' dates of employment, hours worked, rate of pay, and compensation."); *Cortes-Castillo v. One Time Constr. Texas LLC*, No. 21-CV-2093-BH,

2023 WL 4566257, at *13 (N.D. Tex. July 17, 2023) (determining an approximation of plaintiffs' hours after finding "[t]he reported time records, coupled with Plaintiffs' testimony and documentary evidence, are enough to establish the amount and extent of that work as a matter of just and reasonable inference" (citation modified)).

On the other hand, the Court will rely in substantial part on the daily count sheets and payroll records maintained by Defendants to determine the specific dates Plaintiffs worked, because the Court finds that Defendants have (with certain exceptions) credibly rebutted Plaintiffs' unsupported recollections of the specific weeks and days they worked. *See, e.g.*, *Haifeng Xie*, 2019 WL 1568756, at *6 (relying, due to inconsistencies in plaintiff's testimony, on defendants' records to approximate plaintiff's hours even though the records were not "mathematical[ly] exact[]"). The Court emphasizes that it does not find that Plaintiffs intentionally inflated their days worked per week nor their start and end dates in their discovery responses and testimony. Instead, the Court finds only that, after the passage of time and on this particular issue, their independent recollections are for the most part less reliable than the combination of Plaintiffs' tax returns and Defendants' contemporaneous daily count sheets, payroll records, and employment documents. Thus, the Court will only award damages corresponding to dates worked by any particular Plaintiff if those dates are reflected in at least one of the above documents.

### B. Plaintiffs' Rates

"Under the FLSA, the regular rate of pay is typically determined by dividing the employee's weekly compensation by the number of hours for which that compensation is intended." *Chen v. L & H Wine & Liquor, Inc.*, No. 19-CV-6115

(PGG), 2024 WL 1932855, at *6 (S.D.N.Y. May 2, 2024) (internal quotation marks omitted); *Pineda v. Frisolino, Inc.*, No. 15-CV-3774 (GBD), 2017 WL 3835882, at *10 (S.D.N.Y. Aug. 29, 2017) ("Under the FLSA, the 'regular hourly rate of pay of an employee is determined by dividing his total remuneration for employment (except statutory exclusions) in any workweek by the total number of hours actually worked . . . .'" (quoting 29 C.F.R. § 778.109).  Similarly, "[u]nder the NYLL, the 'regular hourly wage rate' for non-hospitality industry employees paid on a weekly basis 'shall be determined by dividing the total hours worked during the week into the employee's total earnings.'" *Kim v. J&J Safetymate Corp.*, No. 22-CV-1070 (TAM), 2025 WL 1384135, at *4 (E.D.N.Y. May 13, 2025) (quoting 12 N.Y.C.R.R. § 142-2.16); *see also Ayala v. Your Favorite Auto Repair & Diagnostic Ctr., Inc.*, No. 14-CV-5269 (ARR) (JO), 2016 WL 5092588, at *22 (E.D.N.Y. Sept. 19, 2016) ("When an employee receives a fixed weekly salary, the first step in calculating the rate at which that employee should receive overtime pay is to determine the 'regular rate of pay,' that is, the employee's fixed salary divided by the number of hours worked in a particular week.").  Thus, the Court will calculate Plaintiffs' regular rate of pay by dividing their weekly pay by the number of hours worked.

The Court will then apply the applicable overtime rate, which is one and a half times the applicable wage, to weeks where Plaintiffs worked five or six days all year, and four days during the busier months (March through October).  *See* 29 U.S.C. § 207(a)(1); 12 N.Y.C.R.R. § 142-2.2.  The total amount Plaintiffs should have received in a given week includes both standard and overtime pay.  The difference between

this amount and what Plaintiffs actually received represents the unpaid wages.  *See, e.g.*, *Cortez v. Brand Name 99 Cents & Up Corp.*, No. 24-CV-5262 (LJL), 2025 WL 1251297, at *8 (S.D.N.Y. Apr. 30, 2025) (calculating overtime unpaid wages).

### C. Hours Worked Before the Warehouse Hours and While Eating Between Assignments

"The FLSA generally mandates compensation for 'the principal activity or activities which [an] employee is employed to perform,' including tasks — even those completed outside a regularly scheduled shift — that are 'an integral and indispensable part of the principal activities.'" *Perez v. City of New York*, 832 F.3d 120, 123 (2d Cir. 2016) (alteration in original) (first quoting 29 U.S.C. § 254(a)(1), then *IBP, Inc. v. Alvarez*, 546 U.S. 21, 30 (2005)).  As the Second Circuit has explained, "[t]he more the [pre- or post-shift] activity is undertaken for the employer's benefit, the more indispensable it is to the primary goal of the employee's work, and the less choice the employee has in the matter, the more likely such work will be found to be compensable.*" Id.* (alteration in original) (quoting *Reich v. New York City Transit Auth.*, 45 F.3d 646, 650 (2d Cir. 1995)); *see also Perry*, 78 F.4th at 519 ("If the proper performance of their job required the preparatory work to be completed [pre-shift], this time should have been counted, regardless of whether anybody specifically instructed them to arrive early."  (alteration in original) (quoting *Kosakow v. New Rochelle Radiology Assocs., P.C.*, 274 F.3d 706, 718 (2d Cir. 2001)).

In addition, "[w]ork during meal breaks is compensable under FLSA if 'predominantly' for the employer's benefit." *Heras v. Metro. Learning Inst., Inc.*, No. 19-CV-02694 (DG) (PK), 2025 WL 1166978, at *10 (E.D.N.Y. Feb. 28, 2025) (quoting

*Lundy v. Catholic Health Sys. of Long Island Inc.*, 711 F.3d 106, 112 (2d Cir. 2013)). "This is a flexible standard that is necessarily fact-bound." *Id.* (quoting *Perkins v. Bronx Lebanon Hosp. Ctr.*, No. 14-CV-01681 (JCF), 2016 WL 6462117, at *4 (S.D.N.Y. Oct. 31, 2016), *aff'd*, 715 F. App'x 103 (2d Cir. 2018)). Relevant to determining whether a meal break is compensable are "the limitations and restrictions placed upon the employees, the extent to which those restrictions benefit the employer, the employee's duties during the meal period, the frequency of meal period interruptions, and whether employees are allowed to resume an interrupted break." *Id.* (quoting *Perkins*, 2016 WL 6462117, at *4); *see also Gao v. Savour Sichuan Inc.*, No. 19-CV-2515 (JPC), 2024 WL 664718, at *20 (S.D.N.Y. Feb. 16, 2024) (noting that, under the FLSA and NYLL, "all of the time worked during a continuous workday is compensable, save for *bona fide* meal breaks" and that, "[f]or a break to so qualify, the employee must be completely relieved from duty for the purposes of eating regular meals." (citation modified)).

The Court finds that Plaintiffs have credibly and consistently testified that the employees conducted essential work-related tasks before the warehouse officially opened each morning. Those activities were "undertaken for the employer's benefit" and were "indispensable . . . to the primary goal of the employee's work.*" Perez*, 832 F.3d at 124. However, Plaintiffs also consistently testified that those activities would take on average 30 minutes, even allowing for occasional delays in getting started with their installations (for example, due to wait times on the part of some employees who needed to use Everlast computers to map their routes). Moreover, at least one

Plaintiff testified that he got to the warehouse 1.5 to 2 hours before it opened to "beat the traffic," which is not compensable time. *See, e.g.*, Jan. 27 Tr. at 358:6–9. Therefore, the Court will calculate each Plaintiff's hours as beginning at approximately 6:30 a.m. for each day worked and continuing for 11 hours, on average, in the busier months and 9.5 hours, on average, in the slower months.

In addition, Plaintiffs consistently testified that they not only frequently ate meals in their own vehicles between their installations, but also that they were encouraged to do so in order to complete their required assignments in one day. Accordingly, the Court will not deduct any time from Plaintiffs' daily hours for a meal break.

## II.  Employers

Defendants argue that Lisa Paone and Arthur Flynn lacked sufficient supervisory control over Plaintiffs to warrant a finding that they were "employers" within the meaning of the FLSA or the NYLL.  (They concede that Anne and Alexa Tiefenworth are employers under the statutes.)  The Court agrees.

The key inquiry in determining "employer" status is whether a defendant possessed "operational control" over the plaintiff-employees.  To hold an individual liable as an employer, a plaintiff must show that he or she exercised "control over a company's actual operations in a manner that relates to a plaintiff's employment." *Tapia v. BLCH 3rd Ave. LLC*, 906 F.3d 58, 61 (2d Cir. 2018) (citation modified).  "A person exercises operational control over employees if his or her role within the company, and the decisions it entails, directly affect the nature or conditions of the employees' employment." *Id.* (citation modified).  In resolving such disputes, courts

48

in this Circuit look to the *Carter* factors: "whether the alleged employer (1) had the power to hire and fire the employees, (2) supervised and controlled employee work schedules or conditions of employment, (3) determined the rate and method of payment, and (4) maintained employment records." *Barfield v. N.Y.C. Health & Hosps. Corp.*, 537 F.3d 132, 142 (2d Cir. 2008) (quoting *Carter v. Dutchess Cmty. Coll.*, 735 F.2d 8, 12 (2d Cir. 1984)); *see also Napoli v. 243 Glen Cove Ave. Grimaldi, Inc.*, 397 F. Supp. 3d 249, 264 (E.D.N.Y. 2019) (applying these factors to determine whether the plaintiffs had shown that an individual acted as an employer under NYLL). None of the four factors standing alone is dispositive. *Tapia*, 906 F.3d at 61.

After considering the *Carter* factors, the Court finds that neither Paone nor Flynn possessed the requisite "operational control" over Plaintiffs to be considered employers under the FLSA and NYLL. Starting with Paone, Everlast's office manager, the evidence at trial demonstrated that, while she was involved in the hiring process, she did not have the power to hire installers without approval from Anne or Alexa. She also did not have the power to fire employees. Similarly, although she applied the Plaintiffs' day rates to calculate their pay each week, this role was ministerial, as she did not have the power to actually set those rates. Moreover, while she, along with Flynn, determined the Plaintiffs routes and maintained Plaintiffs records as the office manager, those two factors do not tip the balance in favor of finding her as an employer.

Flynn, the warehouse manager, was even less involved with hiring than Paone. He did not have the power to hire or fire, certainly did not have the power to set rates,

and was not involved with payroll at all.  As with Paone, although he determined the Plaintiffs' routes each day and worked with them to resolve client issues as they arose in particular jobs, that factor alone is not dispositive.

Accordingly, Paone and Flynn are not subject to individual liability as employers under the FLSA or NYLL.

## III.    FLSA and NYLL Liquidated Damages

The FLSA provides that "a district court is generally required to award a plaintiff liquidated damages equal in amount to actual damages." *Barfield v. New York City Health & Hosps. Corp.*, 537 F.3d 132, 150 (2d Cir. 2008); *see also* 29 U.S.C. § 216(b) ("Any employer who violates [the minimum wage or overtime provisions of the FLSA] shall be liable to the employee or employees affected in the amount of . . . their unpaid overtime compensation . . . and in an additional equal amount as liquidated damages.").  However, the Portal–to–Portal Act, 29 U.S.C. § 251 *et seq.,* which amended the FLSA, "affords district courts discretion to deny liquidated damages where the employer shows that, despite its failure to pay appropriate wages, it acted in subjective 'good faith' with objectively 'reasonable grounds' for believing that its acts or omissions did not violate the FLSA." *Id.* (quoting 29 U.S.C. § 260).

"Notably, liquidated damages are not a penalty exacted by the law, but rather compensation to the employee occasioned by the delay in receiving wages due caused by the employer's violation of the FLSA." *Williams*, 2018 WL 3344217, at *9 (citation modified) (quoting *Herman v. RSR Sec. Servs. Ltd.*, 172 F.3d 132, 143 (2d Cir. 1999)).  Accordingly, courts have observed that "employees demonstrating FLSA overtime violations are presumptively entitled to liquidated damages." *Id.* (citing *Gayle v.*

*Harry's Nurses Registry, Inc.*, 594 F. App'x 714, 718 (2d Cir. 2014) (summary order)). "The employer bears the burden of proving good faith and reasonableness." *Herman*, 172 F.3d at 142. The Second Circuit has described defendants' burden as "a difficult one, with double damages being the norm and single damages the exception." *Id.*

The NYLL's "liquidated-damages provision is very similar to the FLSA's." *Gamero*, 272 F. Supp. 3d at 503; *see also Gonzalez v. Masters Health Food Serv. Inc.*, No. 14-CV-07603 (VEC), 2017 WL 3835960, at *18 (S.D.N.Y. July 27, 2017) (noting that "liquidated damages are also available under NYLL unless the employer proves a good faith basis to believe that its underpayment of wages was in compliance with the law" and that "the burden of proof to establish good faith under NYLL is substantially the same as under the FLSA" (citation modified)). However, the Second Circuit has "interpret[ed] the NYLL and FLSA as not allowing duplicative liquidated damages for the same course of conduct." *Rana v. Islam*, 887 F.3d 118, 123 (2d Cir. 2018).

Defendants argue that they have met their burden of showing that they acted in good faith and thus may avoid paying liquidated damages. They rely principally on litigation that began in 2015 and ended in 2019 regarding whether Everlast's installers were entitled to unemployment benefits under New York law. In that case, the New York Department of Labor initially granted a claim for unemployment benefits by one of Everlast's installers — who is not a plaintiff in this case — in 2015. Everlast appealed, and in 2019, the state's Unemployment Insurance Appeals Board ("UIAB") found that it lacked jurisdiction to review the NYDL's original

determination as to the claimant in that case; however, the UIAB opined that Everlast's *other* installers "are excluded from covered employment for purposes of unemployment insurance" under New York law.  Ex. R at 1385–86; JPTO, Stipulated Fact SSS.

Defendants' argument that they are not liable for liquidated damages turns primarily on what they maintain is their reasonable reliance on this earlier administrative proceeding and, specifically, the UIAB's 2019 ruling on appeal. Defendants argue this UIAB decision made it reasonable for them to presume that Plaintiffs were "independent contractors" under the FLSA.

However, Lisa Paone, the Office Manager, was the only person at Everlast who testified that she spoke to an attorney about the decision or was otherwise aware of it.  Jan. 27 Tr. at 461:25–462:7.  After the UIAB decision, Paone recalls being generally advised by Everlast's counsel that Everlast could continue paying the installers as independent contractors or, in other words, "continue with the status quo."  Jan. 27 Tr. at 460:7–10, 463:2–4.  She was not told anything specifically about the basis of that advice, whether the company had to pay overtime or reimburse for fuel, or New York labor law's wage and hour provisions.  Jan. 27 Tr. at 460:11–461:11. She was not told anything about the FLSA and its requirements.  Jan. 27 Tr. at 461:4–7.  After the UIAB issued its final decision in 2019, Paone testified that she believes she "would have told Alexa and Anne" about it; however, she has no specific recollection of doing so.  Jan. 23 Tr. at 129:4–7.

For her part, Anne Tiefenworth presumed that Everlast's employment practices were lawful because "[i]t's been done that way for as long as the business has been in existence." Jan. 24 Tr. at 178:7–10. She also testified that she believed that at some point before her husband died, he "looked into" the legality of paying the installers as independent contractors by speaking with a lawyer. Jan. 24 Tr. at 178:20–24. However, according to both Anne and Alexa, no one from Everlast took any steps to investigate or confirm the legality of Everlast's payment structure with regards to the installers at any point during the time they were co-owners and operators of the company. Jan. 23 Tr. at 120:21–24; Jan. 24 Tr. at 178:16–19. Anne never asked a lawyer whether she was required to pay an installer overtime or reimburse for work-related expenses. Jan. 24 Tr. at 179:15–24.

Lead counsel for Defendants in the instant case, James Druker, was the same counsel that represented Everlast in the state court proceeding. During trial, Mr. Druker informed the Court that to the best of his recollection, after Michael Tiefenworth's death, the only person with whom he spoke at Everlast about the UIAB decision and its implications was the office manager, Lisa Paone. Counsel did not recall having any conversations with Alexa or Anne regarding the UIAB decision, nor did counsel have any conversations with either Alexa or Anne about the legality of paying the installers as independent contractors until after this lawsuit was filed in October 2021. Jan. 24 Tr. at 144:23–145:11.

Defendants argue that the UIAB's decision, "by itself, provided defendants with a good faith basis to continue treating [all of] the installers as independent

contractors." Def. Mem. at 30.  However, in light of the above testimony, they concede that Anne and Alexa Tiefenworth — who assumed ownership and operation of Everlast prior to both the UIAB's decision and the commencement of this lawsuit— were "not actually aware of that decision."  Def. Mem. at 26.[12]  However, they argue that because Lisa Paone "most certainly was," and because Paone was told by counsel that Everlast "could continue to treat its workers as independent contractors," Def. Mem. at 26, whatever information Paone may have had also establishes Alexa and Anne Tiefenworth's own good faith compliance with the FLSA.[13]

The Court has duly considered Defendants' arguments and the related portions of the factual record but finds them insufficient to meet Defendants' heavy burden of proof.  The Second Circuit has made clear that "[t]o establish good faith, the employer *must take active steps to ascertain the dictates of the FLSA* and then act to comply with them." *Herman*, 172 F.3d at 142 (emphasis added).  It has also explained that "'[g]ood faith' in this context requires more than ignorance of the prevailing law or uncertainty about its development," but rather that the employer act affirmatively to learn about FLSA's requirements and then to comply with them.  *Reich v. S. New England Telecomms. Corp.*, 121 F.3d 58, 71 (2d Cir. 1997).

---

[12] The initial ruling in Everlast's favor (2017) by an administrative law judge predated the time when Anne and Alexa assumed control of Everlast after Michael's death in 2018, and Defendants agree that neither Anne nor Alexa were aware of the 2019 ruling by the UIAB affirming that decision after they took over the business.

[13] Although these arguments were more fully presented in support of Defendants' claim that their FLSA violations were not willful (discussed *infra*), Defendants incorporate those arguments to support their claim that they acted in good faith.  *See* Def. Mem. at 30.

Here, Defendants Anne and Alexa Tiefenworth have not identified a single "active step" they took in ascertaining the dictates of the FLSA, nor any that their subordinates took on their behalf or conveyed to them. They fail to show that they acted in subjective "good faith" with objectively "reasonable grounds" for believing that classifying their employees as independent contractors and not paying them overtime did not violate the FLSA. Indeed, Alexa Tiefenworth testified that, before this lawsuit was filed, she had never even heard of the FLSA. Jan. 30 Tr. at 829:22–24. In addition, according to both Anne and Alexa Tiefenworth, at no point during the years 2018 to 2021, in which they served as the co-owners and principals of Everlast after Michael's death, did they take any steps to investigate the legality of Everlast's payment structure with regard to the installers. Jan. 23 Tr. at 120:21–24; Jan. 24 Tr. at 178:16–19. Moreover, Anne conceded that she never asked a lawyer or anyone else whether she was required to pay an installer overtime or pay for their mileage. Jan. 24 Tr. at 179:15–24. During this time period, the evidence at trial demonstrated that — at the very most — Lisa Paone was the only person at Everlast who may have spoken with an attorney about the UIAB's 2019 decision, and she never relayed that information to either of Everlast's co-owners, who (unlike Paone) actually controlled the pay structure that applied to the installers. Jan. 27 Tr. at 461:25–462:7. The evidence at trial also demonstrated that Paone was not told any specifics about the basis of the state UIAB's decision, nor anything about its potential application to the FLSA. Jan. 27 Tr. at 460:11–461:7.

The Court finds that Defendants have not shown that they acted with a good faith belief that Everlast's payment structure was lawful even though the company, at various points, engaged counsel to assist and consult with them over corporate matters.  Brief conversations with counsel, particularly where Defendants admit they did not ask any questions regarding their obligations under or compliance with wage and hour laws, do not meet Defendants' burden.  *See Hernandez v. Schloss*, No. 12-CV-04339 (ALC), 2020 WL 1228644, at *3 (S.D.N.Y. Mar. 13, 2020) (finding that defendants could not rely on advice regarding legality of classifying drivers as independent contractors because they did not seek out "advice on employment classifications for drivers" but instead "simply had brief conversations with [accountants and outside counsel] during which his beliefs on driver classification were confirmed" and holding that "[b]ecause the purposes of these conversations were not to determine the dictates of the FLSA, these conversations cannot satisfy the good faith exception"); *Copantila v. Fiskardo Estiatorio, Inc.*, 788 F. Supp. 2d 253, 316–17 (S.D.N.Y. 2011) (determining Defendants had not satisfied the good faith exception where the purpose of a consultation with an accountant was not to determine compliance with the FLSA); *Gustafson v. Bell Atl. Corp.*, 171 F. Supp. 2d 311, 327 (S.D.N.Y. 2001) ("[T]here is no evidence that the Company ever sought an expert or outside opinion on whether the contract drivers were exempt from the protections of the FLSA."); *cf. Williams v. Epic Sec. Corp.*, 358 F. Supp. 3d 284, 302–03 (S.D.N.Y. 2019) (finding Defendants satisfied the good faith exception because they "took affirmative steps to monitor legal standards developments in labor law over at least

the past twenty years, including attending conferences and subscribing to and utilizing research databases and newsletters.").

The Court underscores here that it certainly does not find that Anne and Alexa Tiefenworth intentionally paid their installers in a manner that they knew, or had specific reason to know, was unlawful. It was clear from their testimony that they took over control of the business under personally difficult circumstances, without any prior business or management experience; that they presumed Michael Tiefenworth had paid his installers in a lawful manner; and that they simply relied on his methods and payment structure going forward. But it is well established that the FLSA requires far more. As co-owners and operators of Everlast, they benefited from a system that paid installers no overtime, gave them no compensation for mileage or reimbursement for other work-related expenses, and provided them with no breaks for meals — even though the installers' workdays routinely averaged 11 hours or more and required the installers to drive hundreds of miles in their own vehicles in a five-day week. Defendants are therefore liable for liquidated damages under the FLSA and NYLL to each of the Plaintiffs who timely filed their claims.

## IV.    FLSA and NYLL Statute of Limitations

Defendants argue that, even if they are found liable for liquidated damages, they nonetheless did not "willfully" violate the FLSA and thus the shorter, two-year limitations period should apply. The Court agrees.

The FLSA generally provides for a two-year statute of limitations on actions to enforce its provisions but allows a three-year limitations period for "a cause of action

arising out of a willful violation." 29 U.S.C. § 255(a).[14] "An employer willfully violates the FLSA when it either knew or showed reckless disregard for the matter of whether its conduct was prohibited by the Act." *Kuebel*, 643 F.3d at 366 (quoting *Young v. Cooper Cameron Corp.*, 586 F.3d 201, 207 (2d Cir. 2009)). "An employer can evince reckless disregard for the unlawfulness of its conduct even when it 'may not have had actual knowledge of the violative practices.'" *Perry*, 78 F.4th at 520 (quoting *Herman*, 172 F.3d at 141). "Reckless disregard of a fact requires subjective awareness of the probability of the existence of the fact." *Cuahua v. Tanaka Japanese Sushi Inc.*, No. 14-CV-4177 (ER), 2017 WL 4357980, at *6 (S.D.N.Y. Sept. 29, 2017) (citation modified).

Importantly, "if an employer acts unreasonably, but not recklessly, in determining its legal obligation, its action should not be considered willful." *Whiteside v. Hover-Davis, Inc.*, 995 F.3d 315, 324 (2d Cir. 2021)). Moreover, the plaintiff bears the burden of proof on the issue of willfulness for statute of limitations purposes. *Parada v. Banco Indus. de Venezuela, C.A.*, 753 F.3d 62, 71 (2d Cir. 2014).

As a threshold matter, Plaintiffs conflate the burden and standard for the statute of limitations with the burden and standard for liquidated damages. Plaintiffs essentially argue that, if Defendants did not act in good faith to ascertain and comply with their obligations under FLSA, their conduct was necessarily

---

[14] The statute of limitations under the NYLL is six years. NYLL § 663(3). Thus, "a plaintiff may recover under the NYLL for claims arising outside of the FLSA's three-year limitations period." *Bozdogan v. 23 Ludlam Fuel, Inc.*, No. 16-CV-1053 (JMW), 2022 WL 4273851, at *6 (E.D.N.Y. Sept. 15, 2022) (citation modified). Only the named Plaintiffs assert claims under the NYLL.

"willful."  But the two inquiries are separate.  To avoid paying liquidated damages, as discussed *supra*, the statute places the burden on *Defendants* to show that they made a good faith effort to comply with the law.  But on the willfulness inquiry, the burden is on Plaintiffs, and the substantive test is different.  Having heard the evidence and considered the parties' positions and the applicable law, the Court finds that Plaintiffs have not met their burden of showing that Defendants' conduct was willful.  *See, e.g.*, *Cuahua*, 2017 WL 4357980, at *7 (finding that plaintiffs failed to establish willfulness by merely relying on the same facts that established lack of good faith); *McLean v. Garage Mgmt. Corp.*, Nos. 09-CV-9325 (DLC), 10-CV-3950 (DLC), 2012 WL 1358739, at *8, (S.D.N.Y. April 19, 2012) (same).

More specifically, Plaintiffs fail to show by a preponderance of evidence that Defendants' failure to comply with the FLSA was either knowing or reckless.  As noted *supra*, in 2019 the New York State Unemployment Insurance Appeals Board found that certain installers who worked for Everlast were not "employees" entitled to unemployment insurance benefits under the applicable provisions of New York law.  JPTO, Stipulated Fact SSS; Ex. R.  After the decision came down, Paone recalls having been advised by Everlast's counsel that Everlast could continue paying the installers as independent contractors, or in other words, "continue with the status quo."  Jan. 27 Tr. at 460:7–10, 463:2–4.  Anne — who inherited the company after her husband's death — was not aware of the 2019 decision and did not discuss it with Paone or anyone else.  However, she testified that she believed that Everlast's employment practices were lawful because "[i]t's been done that way for as long as

the business has been in existence." Jan. 24 Tr. at 178:7–10. She also testified that she believed her husband had, at some point prior to his death, "looked into" the legality of paying the installers as independent contractors by speaking with a lawyer. Jan. 24 Tr. at 178:20–24.

The Court credits Anne's and Alexa's testimony that they believed — subjectively — that the payment structure Michael had put in place, and which they continued following his death, was probably lawful. While that is plainly insufficient to fulfill their obligations as employers under the FLSA, it does not rise to the level of willfulness. Instead, Defendants' violations are more properly characterized as negligent, rather than reckless or intentional, disregard for Plaintiffs' rights as employees. *See, e.g.*, *Hernandez*, 2020 WL 1228644, at *4 (finding defendants' violation of the FLSA were not willful where they sought general advice regarding paying drivers as independent contractors and it was industry practice); *Valle v. Gordon Chen's Kitchen LLC*, 254 F. Supp. 3d 665, 678 (S.D.N.Y. 2017) (declining to find defendants acted willfully where defendant-manager "credibly affirmed at trial that he had consulted with professionals concerning his obligations concerning payroll" and it "appear[ed] defendants' failure stemmed from their ignorance of this provision, not from an intentional disregard of its requirement" (citation modified)); *Juarez-Cardoso*, 2017 WL 4357009, at *12 ("Plaintiff has not presented evidence showing that Defendants were on notice that they were subject to the FLSA, and thus has failed to meet her burden to show willfulness.").

Accordingly, the two-year statute of limitations will apply to the opt-in Plaintiffs who only assert FLSA claims.[15]  The six-year statute of limitations will apply to the named Plaintiffs, who have also brought claims under the NYLL.  *See Gamero*, 272 F. Supp. 3d at 498 ("If a plaintiff is entitled to damages under both federal and state wage law, the Court has discretion to award that plaintiff damages under the statute providing the greatest amount of relief." (citation modified)); *Hernandez v. JRPAC Inc.*, No. 14-CV-4176 (PAE), 2016 WL 3248493, at *31 (S.D.N.Y. June 9, 2016) ("Plaintiffs' damages award under the NYLL necessarily will subsume their award under the FLSA, both because of the higher minimum wage that

---

[15] Plaintiffs argue that equitable tolling of the FLSA statute of limitations is appropriate here because Defendants "perpetuated the misrepresentation that the installers were independent contractors" and failed to give Plaintiffs notice of their rights under labor laws.  Pl. Mem. at 20–21.  However, for equitable tolling to be appropriate, a plaintiff must establish that (1) "some extraordinary circumstance stood in his way and prevented timely filing," and (2) "he has been pursuing his rights diligently." *Lawrence v. Florida*, 549 U.S. 327, 336 (2007); *see also Zerilli-Edelglass v. New York City Transit Auth.*, 333 F.3d 74, 80 (2d Cir. 2003) (noting that equitable tolling is allowed only in "rare and exceptional circumstances" in which a party "is prevented in some extraordinary way from exercising his rights").  While this Court has found that Defendants' payment structure and recordkeeping did not comply with the FLSA, Plaintiffs have not shown that any extraordinary circumstances "stood in [their] way" of filing timely claims.  As other courts have observed, in the FLSA context, lack of notice of one's labor rights is not enough to show that a plaintiff meets this rare and exceptional circumstance. *See Zhongwei Zhou v. Wu*, No. 14-CV-1775 (RJS), 2017 WL 1233994, at *4 (S.D.N.Y. Mar. 31, 2017) (noting that "courts have generally been reluctant to treat defendant's failure to notify employees of the wage-and-hour laws as sufficient to establish fraudulent concealment for reasons of equitable tolling purposes" (collecting cases)); *Xu v. Ho*, 111 F. Supp. 3d 274, 279 (E.D.N.Y. 2015)  ("[P]laintiff's sole basis for equitable tolling is defendants' failure to post notices or provide plaintiff with statements of hours worked and wages earned. This is an insufficient basis for equitable tolling, as it would provide for equitable tolling whenever a defendant violated FLSA and NYLL by failing to post notices or provide statements of hours and wages.").

governed during certain periods and because of the longer period covered by the NYLL.").

## V.    Mileage Reimbursement for Use of Plaintiffs' Vehicles

Plaintiffs demand reimbursement for vehicle expenses as "tools of the trade" under the FLSA and the NYLL.  Pl. Mem. at 31–32.  "Under the FLSA, an employer may not shift the cost of purchasing 'tools of the trade' to an employee if 'the cost of such tools cuts into the minimum or overtime wages required to be paid him under the [FLSA].'"  *Gamero*, 272 F.Supp.3d at 511 (quoting 29 C.F.R. § 531.35 and *Ortega v. JR Primos 2 Rest. Corp.*, No. 15-CV-9183 (JCF), 2017 WL 2634172, at *3 (S.D.N.Y. June 16, 2017)).  "The same is true under New York Law."  *Hernandez*, 2016 WL 3248493, at *30; *see also* 12 N.Y.C.R.R. § 142-2.10(b) ("The minimum wage shall not be reduced by expenses incurred by an employee in carrying out duties assigned by an employer.").  "Vehicles . . . are considered to be 'tools of the trade,' if the particular employees, such as delivery workers, are required to own and use them during the course of their employment."  *Almanzar v. 1342 St. Nicholas Ave. Rest. Corp.*, No. 14-CV-7850 (VEC) (DF), 2016 WL 8650464, at *7 (S.D.N.Y. Nov. 7, 2016), *report and recommendation adopted*, 2017 WL 1194682, at *1 (Mar. 30, 2017) (citing *Yu G. Ke v. Saigon Grill, Inc.*, 595 F. Supp. 2d 240, 257–58 (S.D.N.Y. 2008)).  Vehicle expenses include gas and maintenance costs.  *See Lu Nan Fan v. Jenny & Richard's Inc.*, 17-CV-6963 (WFK), 2019 WL 1549033, at *12 (E.D.N.Y. Feb. 22, 2019), *report and recommendation adopted*, 2019 WL 1547256, at *1 (Apr. 9, 2019) (awarding damages for gas and maintenance); *Lopez v. MNAF Pizzeria, Inc.*, No. 18-CV-06033 (ALC), 2021 WL 1164336, at *11 (S.D.N.Y. Mar. 25, 2021) (same).  Where, as here, a Plaintiff

was paid a wage above the statutory minimum wage, the relevant inquiry is whether the "tools of the trade" vehicle expenses "reduce[d] the employee's wage below the minimum wage." *See Aquino v. Uber Techs., Inc.*, 671 F. Supp. 3d 338, 349 (S.D.N.Y. 2023). When unreimbursed "tools of the trade" expenses reduce an employee's wage below the statutory minimum, employees are "entitled to the difference between the minimum wage and their actual 'net' wage." *Cuzco v. Orion Builders, Inc.*, 262 F.R.D. 325, 332 (S.D.N.Y. 2009).

Plaintiffs were required to own a personal vehicle and to use this vehicle while working for Everlast. JPTO, Stipulated Fact E; Jan. 27 Tr. at 356:13–15 (installer job postings required applicants to own "a cargo van"). These Plaintiffs spent most of their working time traveling between the various locations where they installed signs for Everlast. The personal vehicles they used to transport themselves and their signs were one of, if not the single, most important tool of their trade. Moreover, Plaintiffs were not reimbursed for fuel, maintenance, or other vehicle-related expenses. JPTO, Stipulated Fact AAA.

However, Plaintiffs are not entitled to "tools of the trade" damages merely by showing that they were not reimbursed for vehicle expenses. "Both the FLSA and NYLL allow employers to shift the cost of business expenses to the employee as long as the expenses do not reduce the employee's wage below the minimum wage." *Aquino*, 671 F. Supp. 3d at 349. Plaintiffs can only recoup these expenses if the money they were required to expend to perform their work for Everlast reduced their wages

below the relevant minimum.  This requires an individualized analysis of the wages each installer received after accounting for unreimbursed vehicle expenses.

The Court first must determine the amount of expenses (*i.e.*, gas and vehicle maintenance) incurred by Plaintiffs in the course of performing work for Defendants. However, Defendants did not document, or require their installers to document, installers' mileage or vehicle expenses.  Likewise, Plaintiffs did not introduce any contemporaneous documentation of mileage or expenses at trial.  Precise accounting of these expenses is thus impossible.

In lieu of precise documentation, the Court will use the IRS standard business reimbursement rate to approximate Plaintiff's vehicle expenses.  *See Xin Long Lin v. New Fresca Tortillas, Inc.*, No. 18-CV-3246 (RJD) (RER), 2019 WL 3716199, at *5 (E.D.N.Y. May 1, 2019), *report and recommendation adopted,* 2019 WL 3714600, at *1 (May 28, 2019) ("Standard reimbursement rates may be used in FLSA cases for determining employees' vehicle expenses where an automobile is a 'tool of the trade.'" (citation modified)); *Bordeau v. V & J Emp't Servs., Inc.*, No. 17-CV-188 (BKS) (CFH), 2018 WL 2041617, at *7 (N.D.N.Y. Mar. 27, 2018) (concluding "that the IRS mileage rate may be a reasonable approximation" of employees' actual vehicle expenses (citing *Perrin v. Papa John's Int'l, Inc.*, 114 F.Supp.3d 707, 721 (E.D. Mo. 2015))).  The IRS mileage rate is advantageous in part because it is comprehensive.  The rate "represents depreciation, maintenance and repairs, gasoline (including taxes), oil, insurance, and vehicle registration fees."  Department of Labor Wage and Hour Division's Field Operations Handbook § 30c15(a).  The mileage rate is also simple to

use, requiring only a finding of daily mileage to calculate the overall vehicle expenses.[16]

Accordingly, in the absence of actual documentation of the miles driven by Plaintiffs, the Court must next determine how many miles the installers drove per day. The Court finds that, on average, Everlast installers drove 125 miles per day throughout the year. It arrives at this figure as a reasonable approximation, based upon the testimony of various trial witnesses regarding the routes typically driven by installers and the factors that may cause the total mileage covered to be shorter or longer on any particular day. *See, e.g.*, *Xin Long Lin*, 2019 WL 3716199, at *5 n.13 (using a "reasonable approximation of Plaintiff's average daily travel distance" where "[t]he Complaint [did] not specify the actual distance Plaintiff travelled as a deliveryman"); *Zellagui v. MCD Pizza, Inc.*, 59 F. Supp. 3d 712, 717 (E.D. Pa. 2014) (using an "average of five roundtrip miles per delivery[,] an average of three deliveries per hour," and the IRS mileage rate to determine out-of-pocket vehicle expenses paid by FLSA collective action class members).

Next, the Court must evaluate the impact of these unreimbursed vehicle expenses on Plaintiffs' hourly rate. Because the IRS reimbursement rate changes annually, the Court will consider each year separately. Further, because the number of hours installers worked per day varies between the busy and slow seasons, separate calculations are required for the two times of year. To conduct this analysis,

---

[16] The Court emphasizes, however, that its decision to use the IRS mileage rate constitutes neither an endorsement of the rate as the sole reasonable approximation of employee vehicle expenses nor a finding that the IRS mileage rate is *per se* reasonable in all circumstances.

first, the average 125 miles driven per day is multiplied by the relevant IRS mileage rate for that year. *See Standard Mileage Rates*, Internal Revenue Service, https://www.irs.gov/tax-professionals/standard-mileage-rates [https://perma.cc/566U -JZSU] (last visited July 28, 2025) (containing IRS mileage rates for the relevant years). Second, the Court subtracts this reasonable approximation of daily vehicle expenses from each Plaintiff's daily rate. Third, the Court divides this difference by the number of hours worked each day, either 11 hours during the busy months (March through October) or 9.5 hours during the slow months (November through February), to arrive at an adjusted hourly rate. Finally, the Court compares this adjusted hourly rate to the relevant minimum wage to determine whether the unreimbursed vehicle expenses impermissibly reduced Plaintiff's wages below the statutory minimum. For named Plaintiffs, who advance NYLL claims, the relevant minimum wage is the New York minimum wage, which changed each year between 2015 through 2021, the years relevant to this suit.[17] *See Minimum Wage Rate Schedule*, New York State's Minimum Wage, https://www.ny.gov/new-york-states-minimum-wage/new-york-

---

[17] The New York state minimum wage varies depending on the region where the work is performed. The record indicates that Everlast installers usually worked in Suffolk and Nassau counties but only occasionally worked in New York City. *See* Jan. 28 Tr. at 542:5–7 (Plaintiff Pietrafesa usually worked a route that extended "up into . . . the Queens borderline"); Jan. 27 Tr. at 407:20–24 (Plaintiff Kelly worked a route that did not include western Long Island or Long Island City); Jan. 29 Tr. at 729:6–10 (Plaintiff Simms generally worked the "south shore area of Long Island" and traveled to Queens only "[o]nce in a while"). Because the record neither indicates that any of the Plaintiffs routinely traveled into New York City nor permits an accounting by the Court of how much time installers worked in New York City relative to Long Island, the Court will apply the relevant minimum wage rate for Suffolk, Nassau, and Westchester counties when evaluating whether unreimbursed vehicle expenses cut into the named Plaintiffs' minimum wage.

states-minimum-wage [https://perma.cc/XQ65-UQXP] (last visited July 28, 2025) (containing New York minimum wage rates for the relevant years). For the opt-in Plaintiffs, who advance only FLSA claims, the relevant minimum wage is the federal minimum wage of $7.25, which remained constant during all years relevant to this suit. For the periods when a Plaintiff's adjusted hourly rate falls below the minimum wage, the Court will award both compensatory and liquidated damages equal to the unreimbursed vehicle expenses for each day that Plaintiff worked during the relevant period.[18]

Having completed these calculations, the Court finds that named Plaintiffs Rafter and Simms are entitled to unreimbursed vehicle expenses as "tools of the trade" damages for certain periods of their employment under the NYLL. The other

---

[18] Both the "tools of the trade" provision of 29 C.F.R. § 531.35 and the "minimum wage shall not be reduced by expenses" provision of 12 N.Y.C.R.R. § 142-2.10(b) are meant to effectuate the minimum wage protections of the FLSA and NYLL, respectively. The Court thus considers damages under these provisions to be compensatory, meant to restore wages that have been unlawfully reduced below the minimum wage by unreimbursed expenses that benefited the employer. "Tools of the trade" expenses thus may be part of a liquidated damages award. *See Almanzar*, 2016 WL 8650464, at *15 (treating "tools of the trade" expenses as an "adjustment" to wages for purposes of awarding liquidated damages); *Xin Long Lin*, 2019 WL 3716199, at *10 (including "tools of the trade" motorcycle costs in both compensatory and liquidated damages totals); *Yu G. Ke*, 595 F. Supp. 2d at 267–81 (awarding both compensatory and liquidated damages for deliverymen's "tools of the trade" expenses related to purchase and maintenance of bicycles and motorbikes); *but see Kim v. Family Bob Inc.*, 20-CV-906 (ENV), 2021 WL 7906544, at *15 (E.D.N.Y. Jan 26, 2021), *report and recommendation adopted*, Dkt. Order dated Mar. 17, 2021 (awarding "tools of the trade" damages separately from overtime wages and liquidated damages). Compensatory "tools of the trade" damages awarded under the NYLL may also be subject to pre-judgment interest as wage adjustments, while liquidated "tools of the trade" damages may not. *See Fermin v. Las Delicias Peruanas Rest., Inc.*, 93 F. Supp. 3d 19, 49 (E.D.N.Y. 2015) (adopting report and recommendation) ("Prejudgment interest is calculated on the unpaid wages due under the NYLL, not on the liquidated damages awarded under the state law" (citation modified)).

Plaintiffs, whose adjusted hourly rates did not fall below the relevant minimum wage, are not entitled to these damages. The Court illustrates its calculations for the relevant periods for Rafter and Kelly in the Award of Damages Section, *infra*.

## VI.     NYLL Wage Notice and Wage Statements

"The Wage Theft Prevention Act of the NYLL requires that employers provide each employee with annual wage notices and accurate wage statements each time wages are paid." *Vazquez v. Cousins Grocery & Grill Inc.*, No. 21-CV-4528 (RML), 2025 WL 1384069, at *8 (E.D.N.Y. May 13, 2025) (citing NYLL §§ 195(1)(a) and (3)). "An employer is required to provide his or her employees, in writing in English and in the language identified by each employee as the primary language of such employee a notice containing the rate or rates of pay and basis thereof, whether paid by the hour, shift, day, week, salary, piece, commission, or other allowances." *Id.* (citation modified) (quoting NYLL § 195(1)(a). In addition, employers must "furnish each employee with a statement with every payment of wages, listing the following: the dates of work covered by that payment of wages; name of employee; name of employer; address and phone number of employer; rate or rates of pay and basis thereof . . . allowances, if any, claimed as part of the minimum wage . . . and net wages." NYLL § 195(3).

Plaintiffs argue that they are entitled to statutory damages because Defendants failed to provide Plaintiffs with the required wage notices and statements. Pl. Mem. at 34. However, to establish Article III standing in federal court, "a plaintiff cannot rely on 'technical violations' of the Labor Law but must allege actual injuries suffered as a result of the alleged wage notice and wage

statement violations." *Guthrie v. Rainbow Fencing Inc.*, 113 F.4th 300, 305 (2d Cir. 2024) (citing *TransUnion LLC v. Ramirez*, 594 U.S. 413, 426 (2021)).  Here, Plaintiffs bear the burden of proving that they suffered an injury-in-fact as a result of not receiving a proper wage notice or proper wage statements, but they fail to present any evidence, argument or even a theory as to how they were injured by the lack of notice and wage statements.  *See Acton v. Powerline Cycles, Inc.*, No. 22-CV-4305 (AEK), 2024 WL 4388483, at *3 (S.D.N.Y. Oct. 3, 2024) ("Without a specific linkage between an employer's failure to provide a wage notice and wage statements and a concrete injury resulting therefrom, the fact that a plaintiff may not have received all the wages he or she was due may not be sufficient to establish standing.").

In light of these recent authorities, because Plaintiffs have not shown how they were injured by the lack of notice and wage statements or would have otherwise done anything differently if they had been provided with the proper notice and statements, they have not met their burden of demonstrating an injury-in-fact for purposes of Article III standing.  *See Gao v. L&L Supplies, Inc.,* No. 22-CV-03722 (JLR), 2024 WL 5088067, at *8 (S.D.N.Y. Dec. 12, 2024) (finding no standing where plaintiff "did not set forth anything in her Complaint or proposed findings of fact and conclusions or law — let alone present any evidence at trial — that demonstrated any concrete injury from not having received compliant wage notices and statements." (citation modified)); *Feng v. Kelai Corp.*, 727 F. Supp. 3d 423, 453 (S.D.N.Y. 2024) (same). Accordingly, the Court may not award statutory damages under the Wage Theft Prevention Act.

## VII. NYLL Spread of Hours

Plaintiffs further seek reimbursement for the additional hours worked pursuant to the NYLL's spread-of-hours requirement. Pl. Mem. at 33. The FLSA does not have a comparable spread-of-hours provision. Because Plaintiffs could not advance NYLL claims as to opt-in Plaintiffs, only named Plaintiffs may claim spread-of-hours premiums. *See* Pl. Mem. at 38 ("Opt-In Plaintiffs are asserting claims under the FLSA only.").

Under the NYLL, an employer must give an employee "one hour's pay at the basic minimum hourly rate, in addition to the minimum wage" for each day in which "the spread of hours exceeds 10 hours." 12 N.Y.C.R.R. § 142-2.4. *See Santillan v. Henao*, 822 F. Supp. 2d 284, 293 (E.D.N.Y. 2011) (noting that New York law "contains a 'spread of hours' provision which allows a plaintiff to recover an extra hour's worth of pay at the minimum wage for each day that an employee works in excess of ten hours" (citing 12 N.Y.C.R.R. § 142-2.4)).

However, "[a]n employee is entitled to [spread-of-hours] pay only if she is paid the minimum wage." *Ying Ying Dai v. ABNS NY Inc.*, 490 F. Supp. 3d 645, 658 (E.D.N.Y. 2020); *see also Williams v. Tri-State Biodiesel, LLC*, No. 13-CV-5041 (GWG), 2015 WL 305362, at *16 (S.D.N.Y. Jan. 23, 2015) ("[R]ecent case law has been nearly unanimous that the spread-of-hours requirement extends only to workers paid at the minimum-wage level." (collecting cases)). Superficially, none of named Plaintiffs was paid at the minimum wage. However, as discussed *supra*, named Plaintiffs Rafter and Simms did receive wages that, due to "kickbacks" to Everlast in the form of unreimbursed personal vehicle expenses, dropped below the minimum

wage.  Their "tools of the trade" damages make them whole for regular hourly wage, bringing their rate up to the statutory minimum for various periods of 2019 and 2020. Accordingly, the Court awards them a spread-of-hours premium, equal to the minimum wage for the relevant year, for each day they worked during the busy months (*i.e.*, the days the Court credits they worked, on average, 11 hours per day). The Court illustrates its calculations for the relevant periods for Rafter and Kelly in the Award of Damages Section, *infra*.

## VIII. NYLL Pre-Judgment Interest

"NYLL provides for the award of pre-judgment interest to prevailing plaintiffs under [NYLL] § 198(1-a)." *Feuer v. Cornerstone Hotels Corp.*, No. 14-CV-5388 (JFB) (SIL), 2020 WL 401787, at *12 (E.D.N.Y. Jan. 24, 2020).[19]  "The applicable interest rate is 9% per annum, calculated from the date each item was incurred or upon all of the damages from a single reasonable intermediate date." *Id.* (citation modified) (quoting N.Y. C.P.L.R. §§ 5001(b), 5004); *see also Santillan*, 822 F. Supp. 2d at 298 (noting that "Section 5001 of New York's Civil Practice Law and Rules governs the calculation of prejudgment interest for violations of the state's Labor Law").

"Courts applying the NYLL in wage-and-hour cases often choose the midpoint of the plaintiff's employment in computing prejudgment interest." *Chen v. Hunan Manor Enter., Inc.*, 17-CV-802 (GBD) (GWG), 2023 WL 5574854, at *19 (S.D.N.Y.

---

[19] "Federal courts have long recognized that prejudgment interest may not be awarded in addition to liquidated damages for violations of the FLSA." *Santillan*, 822 F. Supp. 2d at 298 (citing *Brock v. Superior Care, Inc.*, 840 F.2d 1054, 1064 (2d Cir. 1998).  Here, because the Court awards FLSA liquidated damages to them, opt-in Plaintiffs are not entitled to pre-judgement interest.

Aug. 29, 2023), *amended on reconsideration in part*, 2023 WL 8434700 (S.D.N.Y. Dec. 5, 2023) (citation modified) (citing N.Y. C.P.L.R. 5001(b)); *see also Gamero*, 272 F. Supp. 3d at 515 (finding this midpoint should be "within the limitations period." (quoting *Hengjin Sun v. China 1221, Inc.*, 12-CV-7135 (RJS), 2016 WL 1587242, at *6 (S.D.N.Y. Apr. 19, 2016)).   For each named Plaintiff, the Court will make a determination of the appropriate midpoint for computing prejudgment interest in the Award of Damages Section, *infra*.

"Prejudgment interest applies only to the amount of compensatory damages, and excludes the amount of liquidated damages." *Juarez-Cardoso*, 2017 WL 4357009, at *19 (quoting *Maldonado v. La Nueva Rampa, Inc.*, No. 10-CV-8195 (LLS) (JLC), 2012 WL 1669341, at *11 (S.D.N.Y. May 14, 2012)); *Gamero*, 272 F. Supp. 3d at 515 ("An NYLL plaintiff may recover prejudgment interest only on his actual damages under the NYLL, not his liquidated damages."). Accordingly, named Plaintiffs are entitled to pre-judgment interest only for their compensatory unpaid overtime damages, "tools of the trade" damages, and spread-of-hours premiums, not their liquidated damages.[20]

## **AWARD OF DAMAGES**

In light of the foregoing, the Court now proceeds to calculate the damages owed to each Plaintiff, if any, as a result of the Defendants' violations.

---

[20] The Court awards named Plaintiffs, who asserted claims under both the FLSA and the NYLL, liquidated damages under the NYLL; they are therefore entitled to pre-judgment interest. *Tackie v. Keff Enterprises LLC*, No. 14-CV-2074 (JPO), 2014 WL 4626229, at *5 (S.D.N.Y. Sept. 16, 2014) ("[P]laintiffs are entitled to prejudgment interest on any compensatory damages awarded under the NYLL for which there is no corresponding award of liquidated damages under FLSA.").

Before Plaintiffs' hours and damages may be ascertained, the Court must determine what constitutes a "workweek" at Everlast.  An employee's workweek "is a fixed and regularly recurring period of 168 hours — seven consecutive 24-hour periods."  29 C.F.R. § 778.105.  Significantly, the workweek "need not coincide with the calendar week but may begin on any day . . . ."  *Id.*  Testimony at trial established that Everlast employees were regularly paid on Thursdays for the seven-day period beginning the previous Friday and running through the Thursday payday.  Jan. 23 Tr. at 51:10–15, 113:16–24.  This is confirmed by the payroll records produced by Defendants, which, with limited exceptions, show employees were paid on Thursdays as a matter of course.  Accordingly, the Court will consider Everlast employees' workweek to be Friday through Thursday for purposes of evaluating how many days and hours per workweek each employee worked.

As discussed *supra*, the Court finds, as a matter of reasonable inference from all of the evidence presented, that on average, the installers worked (1) 11 hours per day in the busier months of the year (March through October) — typically beginning their day at 6:30 a.m., and concluding at approximately 5:30 p.m., with some days requiring shorter or longer periods to complete their assignments; and (2) 9.5 hours per day in the slower months (November through February).

Thus, for four-day weeks worked in March through October, Plaintiffs worked an average of 44 hours and are entitled to 4 hours of overtime per week. For five-day weeks in March through October, Plaintiffs worked an average of 55 hours and are entitled to 15 hours of overtime per week.  For five-day weeks worked in November

through February, Plaintiffs worked an average of 47.5 hours and are entitled to 7.5 hours of overtime per week.  For six-day weeks worked in March through October, Plaintiffs worked an average of 66 hours and are entitled to 26 hours of overtime per week.  Finally, for six-day weeks worked in November through February, Plaintiffs worked an average of 57 hours and are entitled to 17 hours of overtime per week.

Where the payroll records reflect that a Plaintiff was paid for a five- or six-day week on a Thursday, but the daily log records do not reflect that he worked a five-day week the week before, the Court will consider that week to be a five- or six-day week and award overtime accordingly.  The same applies when the payroll records reflect a four-day week during the months of March through October.  Moreover, where payroll does not reflect a four-, five-, or six-day workweek, but the daily count records do, the Court will consider that to be a four-, five-, or six-day workweek and award overtime accordingly.  In essence, due to the observed unreliability of Defendants' records and the unmet duty of Defendants to maintain accurate documentation of hours worked, the Court will construe errors in favor of Plaintiffs and credit overtime whenever either the Defendants' payroll or daily count records indicate that overtime is owed for any given workweek.

The Court makes compensatory and liquidated damages awards under the FLSA and the NYLL, as appropriate.  For named Plaintiffs, who assert claims under both the FLSA and the NYLL, the Court awards damages under the NYLL, which allows for greater recovery.  *See Astudillo v. Fusion Juice Bar, Inc.*, 19-CV-2590 (EK) (CLP), 2023 WL 3802754, at *8 (E.D.N.Y. Mar. 23, 2023), *report and recommendation*

*adopted*, 2023 WL 5436131, at *1 (Aug. 23, 2023) ("While a defendant's failure to pay minimum wages and overtime violates both the FLSA and the NYLL, a plaintiff may only recover damages under one statute, as 'double recovery of the same wages and related damages is not permitted.' . . . Courts will thus award damages under whichever statute would allow for greater recovery." (quoting *Gonzales v. Gan Israel Pre-Sch.*, No. 12-CV-6304, 2014 WL 1011070, at *11 (E.D.N.Y. Mar. 14, 2014) (adopting report and recommendation)).

Finally, as noted *supra*, the Court will award compensatory "tools of the trade" damages and spread-of-hours premiums to Rafter and Simms under the NYLL. The Court further awards liquidated damages equal to each of these compensatory awards to Rafter and Simms.

Because the parties' records and testimony varied as to each Plaintiffs' specific workdays and the length of their workweeks, the Court will review those disputes and make an award of damages for each Plaintiff individually. The total damages awarded amount to $55,464.66 in compensatory damages, plus $55,464.66 in liquidated damages.

## I.    Named Plaintiff Frank Rafter

The parties agree that Rafter began working at Everlast before the period of time covered by the NYLL statute of limitation began on August 15, 2015. However, he contends that his last day at Everlast was on December 6, 2020, while Defendants argue that his tenure ended earlier, on November 26, 2020. Pl. Mem. at 36. Because Defendants' paycheck records show that Rafter's last paycheck was issued on December 3, 2020, and the daily count sheets produced by Defendants indicate Rafter

worked on December 2, 2020, the Court will consider December 3, 2020 to be Rafter's last day. *See* Ex. A (payroll); Ex. 43 (daily count sheets).

Rafter claims that he worked 20 five-day weeks[21] in 2015, 52 five-day weeks in 2016, 52 five-day weeks in 2017, 52 five-day weeks in 2018, 52 five-day weeks in 2019, and 50 five-day weeks in 2020. Ex. 18. Defendants say that Rafter only worked 25 weeks in 2020 and assert that their records demonstrate that Rafter's claims are inflated. Def. Mem. at 14. Defendants produced payroll and daily count records that, when read together, permit an independent inquiry into the number of days Rafter worked in any given workweek. *See* Ex. A[22] (payroll covering November 11, 2015 through December 3, 2020); Ex. 43 (daily count sheets covering July 10, 2007 through December 2, 2020).

After comparing the payroll records provided for Rafter to Everlast's daily count sheets, the Court concludes the payroll records are generally reliable, albeit imperfect, and will credit the documentation produced by Defendants. Thus, for the periods where Defendants provided daily count sheets and/or payroll records (November 5, 2015 to December 2020), the Court will rely on Defendants' records to determine the number of days worked per week.

---

[21] Plaintiffs seek damages for 27 weeks in 2015, from July 15 through December 31. Ex. 18. The period between July 15 and August 15, 2015 is beyond the NYLL statute of limitations. Between August 15 and December 31, 2015, there were 20 Thursdays (*i.e.*, paydays), so the Court considers Plaintiffs' claim to be for 20 five-day weeks in 2015.

[22] Payments to Rafter were made under the name "Innovative Installations," a corporation owned by Rafter. *See* JPTO, Stipulated Fact JJJ.

The Court finds that, from August 15, 2015 through January 30, 2020, Rafter worked 123 five-day weeks and 23 four-day weeks during the busy months (March through October) and 40 five-day weeks during the slow months (November through February).  The Court further finds that, between February 2020 and December 2020, Rafter worked 15 five-day weeks and 8 four-day weeks during the busy months (March through October) and 4 five-day weeks during the slow months (November through February).

Rafter contends he was paid a rate of $1,000 per week from 2014 through 2018 and that, from 2018 through 2020, he was paid an increased rate of $1,050 per week. Ex. 18; Pl. Post-Trial Br. Attach. 1, ECF No. 126-1 (Mar. 25, 2025) (Rafter revised spreadsheet).  However, it appears from Defendants' payroll records that Rafter did not begin receiving a weekly rate of $1,050 until February 2020.  *See* Ex. A-5 (payroll records indicating weekly pay of $1,000 on January 23 and 30, 2020 but weekly pay of $1,050 on February 13, 2020 for $1,050).  Thus, the Court applies a pay rate of $1,000 per five-day week from August 15, 2015 to January 30, 2020, and $1,050 per five-day week for February 2020 through his last payday in December 2020.

As for Rafter's hourly rate, for the four- and five-day weeks that the Court credits Rafter worked 11 hours per day (March through October), the Court will apply an hourly rate of $18.18 from August 15, 2015 until January 30, 2020 ($1,000 divided by 55 hours) and $19.09 from February 2020 until November 2020 ($1,050 divided by 55 hours).  For the five-day weeks that the Court credits Rafter worked 9.5 hours per day (November through February), the Court will apply an hourly rate of $21.05 from

August 15, 2015 until January 30, 2020 ($1,000 divided by 47.5 hours) and $22.11 from February 2020 until November 2020 ($1,050 divided by 47.5 hours). As shown in the appendix, after calculating the applicable rate (the overtime rate minus the hourly rate), the Court finds that Rafter is owed $25,480.48 for unpaid overtime under the NYLL, plus $25,480.48 in liquidated damages.

Additionally, as discussed *supra,* Rafter is entitled to "tools of the trade" damages.  To reiterate, Rafter worked for Everlast before the NYLL statute of limitations of August 15, 2015 through December 3, 2020.  His daily rate was $200 per day from 2015 through January 30, 2020 and $210 per day from February 2020 through December 2020.  From 2015 through 2018, Rafter's hourly rate, adjusted by unreimbursed vehicle expenses, did not fall below the New York minimum wage for Long Island and Westchester.

However, on December 31, 2018, the Long Island and Westchester minimum wage increased to $12 per hour.  In 2019, the IRS standard mileage rate was $.58 per mile.  This means, with an average of 125 miles driven per day, Rafter incurred daily vehicle expenses of $72.50.  Taking the difference between Rafter's 2019 daily rate of $200 and his vehicle expenses, Rafter's adjusted daily rate was $127.50. Dividing this difference by 11 hours for the busy months yields an adjusted hourly rate of $11.59 for March through October.  Dividing by 9.5 hours for the slow months yields an adjusted hourly rate of $13.42.  Thus, Rafter received a wage below the New York minimum from March through October 2019.

Accordingly, the Court will award Rafter compensatory damages of \$.41, the difference between the Long Island and Westchester minimum wage and his actual "net" wage, for each day that he worked from March through October 2019. The Court finds Rafter worked 171 days during this period. *See* Ex. 43. Rafter's "tools of the trade" compensatory damages for unreimbursed vehicle expenses total \$70.11 for 2019.

For 2020, when the Long Island and Westchester minimum wage increased to \$13 and the IRS mileage rate decreased to \$.575 per mile, both Rafter's first adjusted hourly rate of \$13.49 (from January 1 through January 30) and his second adjusted hourly rate of \$14.54 (following his pay increase in February) for the slow months (November through February, when he worked 9.5 hours per day) were above the minimum wage. During the busy months (March through October), when Rafter worked 11 hours per day, his hourly rate dropped to \$12.56. Again, Rafter was receiving a wage below the New York minimum from March through October 2020.

Accordingly, the Court will award Rafter compensatory damages of \$.44, the difference between the Long Island and Westchester minimum wage and his actual "net" wage, for each day he worked from March through October 2020. The Court finds Rafter worked 139 days during this period. *See* Ex. 43. Rafter's "tools of the trade" compensatory damages for unreimbursed vehicle expenses total \$63.94 for 2020. In sum, the Court awards Rafter \$131.26 in "tools of the trade" compensatory damages under the NYLL, plus \$131.26 in liquidated damages.

Rafter is also entitled to a spread-of-hours premium equal to one hour at the Long Island and Westchester minimum wage for each day that he worked more than 10 hours while being paid the minimum wage.  This period is identical to the busy months for which he is awarded "tools of the trade" damages, because the Court finds that he worked, on average, 11 hours per day and that he should have received the minimum wage for his work, notwithstanding the "kickbacks" to his employer in the form of unreimbursed vehicle expenses.

For 2019, the relevant minimum wage was $12 per hour.  Rafter worked 171 days during the busy period.  Accordingly, he is owed $2,052 in spread-of-hours premiums for 2019.  For 2020, the relevant minimum wage was $13 per hour.  Rafter worked 139 days during the busy period.  Accordingly, he is owed $1,807 in spread-of-hours premiums for 2020.   In sum, the Court awards Rafter $3,859 in compensatory spread-of-hours premiums under the NYLL, plus $3,859 in liquidated damages.

Rafter's overall award thus totals $29,470.74 in compensatory damages under the NYLL, plus $29,470.74 in liquidated damages.

Finally, as to Rafter's pre-judgment interest, the Court selects the midpoint between August 15, 2015, the NYLL statute of limitations, and December 3, 2020, his last day of work, as the point from which interest shall be calculated.  The midpoint between these two days is April 9, 2018.  The pre-judgment interest on this compensatory damage award is nine per cent per annum.  N.Y. C.P.L.R. § 5004.  Therefore, the Court respectfully directs the Clerk of Court to calculate the proper

pre-judgment interest on Rafter's $29,470.74 compensatory damages award from April 9, 2018 through the date judgment is entered.

## II.    Named Plaintiff Thomas Kelly

The parties agree that Kelly began working at Everlast before the NYLL statute of limitation period began on August 15, 2015, and ended his employment on June 6, 2019.  Pl. Mem. at 37; Def. Mem. at 15–16.  Defendants produced records that confirm this tenure of employment.  *See* Ex. B-6 (employment contract dated July 23, 2015).

Kelly claims that he worked 20 five-day weeks[23] in the relevant period of 2015, 52 five-day weeks in 2016, 17 five-day weeks in 2017, 52 five-day weeks in 2018, and 17 five-day weeks in 2019.  Ex. 19.  Defendants contest these assertions but do not offer their own accounting of how many four- or five-day weeks Kelly worked.  *See* Def. Mem. at 15–17.  Defendants produced daily count and payroll records pertaining to Kelly.  *See* Ex. B-5 (daily count sheets); Ex. 47 (payroll).  However, Defendants' records are incomplete.  Defendants only provided partial daily count sheets from 2017 to 2019.  *See* Ex. B-5.  Moreover, there are only three daily count entries for 2017 and there is no dispute that Kelly worked more than 3 days that year.

---

[23] Plaintiffs seek damages for 24 weeks in 2015, from July 15 through December 31.  Ex. 19.  The period between July 15 and August 15, 2015 is beyond the NYLL statute of limitations.  Between August 15 and December 31, 2015, there were 20 Thursdays (*i.e.*, paydays), so the Court considers Plaintiffs' claim to be for 20 five-day weeks in 2015.

Defendants also produced payroll records, but these only begin in November 2015 for Kelly.  *See* Ex. 47.[24]

As such, given the clear mandate in the NYLL for the employer to keep accurate statements and the absence of Defendants' accurate record-keeping, the Court will credit Kelly's estimates for the weeks he worked five days during the periods in which Defendants records are entirely missing (August 15, 2015 through October 2015) for purposes of calculating damages under the NYLL.  *See Gamero*, 272 F. Supp. 3d at 498 ("[T]he NYLL — unlike the FLSA — does not permit an employer to discharge this burden [of keeping records of accurate hours] by undermining the reasonableness of an employee's evidence that he was underpaid. . . . The NYLL is more demanding: An employer must demonstrate that it in fact paid its employees 'wages, benefits, and supplements.'" (citation modified) (quoting NYLL § 196-a(a)).

After comparing the payroll records provided for Kelly to Everlast's daily count sheets, the Court concludes the payroll records are generally reliable and will credit the documentation produced by Defendants.  Thus, for the periods where Defendants provided daily count sheets and/or payroll records (November 5, 2015 to June 2019), the Court will rely on Defendants' records to determine the number of days worked per week.

---

[24] Payments to Kelly were variously made to him under his name and to his two corporations, "Keltom, Inc." and "Tom Enterprises, Inc."  *See* JPTO, Stipulated Fact GGG.

The Court finds that, from August 15, 2015 through October 31, 2018, Kelly worked 55 five-day weeks and 19 four-day weeks during the busy months (March through October) and 10 five-day weeks during the slow months (November through February).[25]  The Court further finds that, between November 2018 and June 2019, Kelly worked 12 five-day weeks and 1 four-day week during the busy months (March through October) and 10 five-day weeks during the slow months (November through February).

As for Kelly's hourly rate, he testified that his daily rate started at $200 and increased to $210 by the time he stopped working for Everlast. Jan. 27 Tr. at 382:24–25.  The payroll documents produced by Defendants indicate he made $1,000 per five-day week worked from 2015 until approximately November 2018.  *See* Ex. 47.  Testimony supports this finding.  Jan. 27 Tr. at 433:4–6.  Beginning in November 2018, Kelly was paid $1,050 per five-day week worked.  *See* Ex. 47.  Thus, for the five-day weeks that the Court credits Kelly worked 11 hours per day (March through October), the Court will apply an hourly rate of $18.18 ($1,000 divided by 55 hours) before November 2018 and an hourly rate of $19.09 ($1,050 divided by 55 hours) after November 2018.  For the five-day weeks that the Court credits Kelly worked 9.5 hours per day (November through February), the Court will apply an hourly rate of $21.05 ($1,000 divided by 47.5 hours) before November 2018 and an hourly rate of $22.11 ($1,050 divided by 47.5 hours) from November 2018.

---

[25] The Court notes that Kelly did not work for Everlast between November 2017 through February 2018 due to various health issues. Jan. 27 Tr. at 412:18–22.

As shown in the appendix, after calculating the applicable rate (the overtime rate minus the hourly rate), the Court finds that Kelly is owed $11,565.04 for unpaid overtime under the NYLL, plus $11,565.04 in liquidated damages.

Finally, as to Kelly's pre-judgment interest, the Court selects the midpoint between August 15, 2015, the NYLL statute of limitations, and June 6, 2019, his last day of work, as the point from which interest shall be calculated. The midpoint between these two days is July 7, 2017. The pre-judgment interest on this compensatory damage award is nine per cent per annum. N.Y. C.P.L.R. § 5004. Therefore, the Court respectfully directs the Clerk of Court to calculate the proper pre-judgment interest on Rafter's $11,565.04 compensatory damages award from April 9, 2018 through the date judgment is entered.

## III.  Named Plaintiff Sefu Simms

Simms claims that he worked for Everlast from August 2019 until October 16, 2020, while Defendants contend that he worked from August 18, 2019 through September 30, 2020. Pl. Mem. at 37–38. Defendants provided daily count records and payroll records from August 2019 through September 2020. *See* Ex. 43 (daily count sheets); Ex. 47 (payroll). In addition, the contract agreement Simms signed when he started working for Everlast is dated August 8, 2019. *See* Ex. 41. After comparing the payroll records provided for Simms to Everlast's daily count sheets, the Court concludes the payroll records are generally reliable and will credit the documentation produced by Defendants.

The Court will award Simms overtime wages for four- and five-day weeks worked during March through October, and five-day weeks worked November

through February from August 2019 through September 2020, based on the daily count sheets and payroll records. Having reviewed the records produced by Defendants, the Court finds Simms worked 2 six-day weeks, 19 five-day weeks, and 8 four-day weeks during the busy months (March through October), and 3 five-day weeks during the slow months (November through February).

As for Simms's hourly rates, he received $900 per five-day week worked. *Compare* Ex. 47 (payroll indicating $900 pay on August 22, 2019), *with* Ex. 43 (daily count sheets indicating five days worked between August 16 and 22, 2019). This equates to a daily rate of $180. Accordingly, for the five-day weeks that the Court credits Simms worked 11 hours per day (March through October), the Court will apply an hourly rate of $16.36 ($900 divided by 55 hours). For the five-day weeks that the Court credits Simms worked 9.5 hours per day (November through February), the Court will apply an hourly rate of $18.95 ($900 divided by 47.5 hours).

As shown in the appendix, after calculating the applicable rate (the overtime rate minus the hourly rate), the Court finds that Simms is owed $3,231.72 for unpaid overtime under the NYLL, plus $3,231.72 in liquidated damages.

Additionally, as discussed *supra,* Simms is entitled to "tools of the trade" damages. To reiterate, Simms worked for Everlast from August 2019 through September 2020. His daily rate was $180 per day. Simms's hourly rate, adjusted by unreimbursed vehicle expenses, fell below the New York minimum wage for Long Island and Westchester during his entire tenure of employment.

For 2019, the Long Island and Westchester minimum wage was $12 per hour and the IRS standard mileage rate was $.58 per mile. This means, with an average of 125 miles driven per day, Simms incurred daily vehicle expenses of $72.50. Taking the difference between Simms's daily rate of $180 and his vehicle expenses, Simms's adjusted daily rate was $107.50. Dividing this difference by 11 hours for the busy months yields an adjusted hourly rate of $9.77 for March through October. Dividing by 9.5 hours for the slow months yields an adjusted hourly rate of $11.32. Thus, Simms received a wage below the New York minimum from August through December 2019.

Accordingly, the Court will award Simms compensatory damages of $2.23, the difference between the Long Island and Westchester minimum wage and his actual "net" wage during the busy months, for each day that he worked from August through October 2019, and $.68, the difference between the minimum wage and his "net" wage during the slow months, for each day he worked from November through December 2019. The Court finds Simms worked 49 days during the busy months and 24 days during the slow months in 2019. *See* Ex. 43. Simms's "tools of the trade" compensatory damages for unreimbursed vehicle expenses total $125.59 for 2019.

For 2020, when the Long Island and Westchester minimum wage increased to $13 and the IRS mileage rate decreased to $.575 per mile, Simms's adjusted hourly rate was $11.38 for the slow months (November through February, when he worked 9.5 hours per day) and $9.83 for the busy months (March through October,

when he worked 11 hours per day). Again, Simms was receiving a wage below the New York minimum from January through December 2020.

Accordingly, the Court will award Simms compensatory damages of $3.17, the difference between the Long Island and Westchester minimum wage and his actual "net" wage during the busy months, for each day that he worked from March through September 2020, and $1.62, the difference between the minimum wage and his "net" wage during the slow months, for each day he worked from January through February 2020. The Court finds Simms worked 114 days during the busy months and 38 days during the slow months in this period. *See* Ex. 43. Simms's "tools of the trade compensatory damages for unreimbursed vehicle expenses total $422.94 for 2020. In sum, the Court awards Simms $548.53 in "tools of the trade" compensatory damages under the NYLL, plus $548.53 in liquidated damages.

Simms is also entitled to a spread-of-hours premium equal to one hour at the Long Island and Westchester minimum wage for each day that he worked more than 10 hours while being paid the minimum wage. This period is identical to the busy months for which he is awarded "tools of the trade" damages, because the Court finds he worked, on average, 11 hours per day and that he should have received the minimum wage for his work, notwithstanding the "kickbacks" to his employer in the form of unreimbursed vehicle expenses.

For 2019, the relevant minimum wage was $12 per hour. Simms worked 49 days during the busy period. Accordingly, he is owed $588 in spread-of-hours premiums for 2019. For 2020, the relevant minimum wage was $13 per hour. Simms

worked 114 days during the busy period. Accordingly, he is owed $1,482 in spread-of-hours premiums for 2020. In sum, the Court awards Simms $2,070 in compensatory spread-of-hours premiums under the NYLL, plus $2,070 in liquidated damages.

Simms's overall award thus totals $5,850.25 in compensatory damages, plus $5,850.25 in liquidated damages.

Finally, as to Simms's pre-judgment interest, the Court selects the midpoint between August 18, 2019, his first day of work, and October 16, 2020, his last day of work, as the point from which interest shall be calculated. The midpoint between these two days is March 17, 2020. The pre-judgment interest on this compensatory damage award is nine per cent per annum. N.Y. C.P.L.R. § 5004. Therefore, the Court respectfully directs the Clerk of Court to calculate the proper pre-judgment interest on Simms' $5,850.25 compensatory damages award from March 17, 2020 through the date judgment is entered.

## IV.   Opt-in Plaintiff John Kovalsky

The parties agree that Kovalsky worked for Everlast from May 23, 2019 through November 2019 and during two weeks in July 2020. Pl. Mem. at 41; Def. Mem. at 19–20. Defendants produced records from the relevant time periods that confirm these dates. *See* Ex. Q-2 (daily count sheets); Ex. Q-3 (payroll). The Court credits the documentation provided by Defendants. Because Kovalsky's tenure with Everlast spans both the busy months and the slow months, the Court will award Kovalsky overtime wages for four- and five-day weeks worked during March through October, and five-day weeks worked November through February for the period

within the FLSA statute of limitations, beginning when his claim accrued on his August 15, 2019 payday. *See Shu Qin Xu v. Wai Mei Ho*, 111 F. Supp. 3d 274, 277 (E.D.N.Y 2015) ("A cause of action under the FLSA accrues on the regular payday immediately following the work period for which services were rendered and not properly compensated." (citation modified)).

The Court finds Kovalsky worked 3 five-day weeks (August 9 to 15, 2019; August 23 to 29, 2019; and September 6 to 12, 2019) and 3 four-day weeks (August 16 to 22, 2019; August 30 to September 5, 2019; and July 10 to 16, 2020) during the busy months (March through October). While Kovalsky worked many more five-day weeks, and at least one seven-day week, these paydays fall before the August 15, 2019 FLSA statute of limitations and therefore are not recoverable. Kovalsky did not work any five-day weeks during the slow months in which he was employed by Everlast within the limitations period.

As for Kovalsky's hourly rate, he was paid $900 for the five-day weeks he worked, indicating a daily rate of $180. For these five-day weeks that the Court credits Kovalsky worked 11 hours per day (March through October), the Court will apply an hourly rate of $16.36 ($900 divided by 55 hours).

As shown in the appendix, after calculating the applicable rate (the overtime rate minus the hourly rate), the Court finds that Kovalsky is owed $466.26 for unpaid overtime under the FLSA, plus $466.26 in liquidated damages.

## V.  Opt-in Plaintiff Mark Corrado

Plaintiffs assert that Corrado worked for Everlast from August 2018 through January 31, 2021, and Defendants do not contest these dates of employment. *See* Pl.

Mem. at 41; Def. Mem. at 12.  Corrado's daily count sheets and payroll records, entered into evidence at trial by Plaintiffs, suggest Corrado worked for Everlast as early as 2015.  *See* Ex. 48 (payroll records spanning June 2018 to April 2019); Ex. 43 (daily count sheets spanning May 2015 to January 2021).  The Court generally credits the contemporaneous payroll and daily count documents, though resolving when Corrado began working for Everlast is unnecessary.  Because Corrado is an opt-in Plaintiff only asserting a cause of action under the FLSA, the two-year statute of limitations will bar recovery for any unpaid overtime before August 15, 2019.  Because Corrado's tenure with Everlast spanned both the busy months (March through October) and the slow months (November through February), the Court will award him overtime for the five-day weeks he worked between November 2019 and February 2020 and between November 2020 and January 2021, and for the four- and five-day weeks he worked between August 2019 and October 2019 and between March 2020 and October 2020.

The Court finds Corrado worked 2 six-day weeks (June 19 to 25, 2020 and June 26 to July 2, 2020), 19 five-day weeks (August 16 to 22, 2019; August 23 to 29, 2019; September 13 to 19, 2019; September 20 to 26, 2019; September 27 to October 3, 2019; October 4 to 10, 2019; October 25 to 31, 2019; February 28 to March 5, 2020[26]; March 6 to 12, 2020; June 12 to 18, 2020; July 3 to 9, 2020; July 10 to 16, 2020; July 24 to

---

[26] Because this week spans the last day of the slow season (9.5 hours per day) and the first days of the busy season (11 hours per day), the Court deems Corrado to have worked 53.5 hours during this week (one day of 9.5 hours and four days of 11 hours).  The Court will apply the busy month hourly rate for overtime worked during this week.

30, 2020; July 31 to August 6, 2020; August 7 to 13, 2020; August 14 to 20, 2020; September 18 to 24, 2020; September 25 to October 1, 2020; and October 2 to 8, 2020), and 10 four-day weeks (August 30 to September 5, 2019; October 11 to 17, 2019; October 18 to 24, 2019; March 13 to 19, 2020; April 17 to 23, 2020; July 17 to 23, 2020; September 4 to 10, 2020; September 11 to 17, 2020; October 16 to 22, 2020; and October 23 to 29, 2020) during the busy months (March through October), and 8 five-day weeks (November 1 to 7, 2019; November 8 to 14, 2019; November 15 to 21, 2019; January 3 to 9, 2020; January 10 to 16, 2020; February 7 to 13, 2020; October 30 to November 5, 2020[27]; and December 18 to 24, 2020) during the slow months (November through February).

As for Corrado's hourly rate, the payroll records produced by Defendants do not permit a direct inquiry into the weekly and daily rate(s) paid during the period when Corrado worked for Everlast within the FLSA two-year statute of limitations. *See* Ex. 48 (payroll records beginning June 21, 2018 and concluding April 25, 2019). Corrado testified that, when he began working for Everlast, he was paid $1,000 per five-day week worked, and that this weekly sum increased to $1,050 after one year and to $1,100 after another year. Jan. 29 Tr. at 585:19–25. This original sum of $1,000 is confirmed by the payroll records in evidence. *See* Ex. 48 (showing regular weekly payments in the amount of $1,000 during 2019). The incompleteness of the

---

[27] Because this week spans the last day of the busy season (11 hours per day) and the first days of the slow season (9.5 hours per day), the Court deems Corrado to have worked 49 hours during this week (one day of 11 hours and four days of 9.5 hours). The Court will apply the slow month hourly rate for overtime worked during this week.

records produced by Defendants, however, prevents the Court from ascertaining when precisely Corrado would have begun receiving the higher weekly rates. The Court will credit Corrado's testimony that his weekly rate increased from $1,000 to $1,050 sometime during 2019; this finding is bolstered by several instances in 2018 and 2019 when Corrado was paid $1,050 per week. *See* Ex. 43 (showing weekly payments of $1,050 on August 16, 2018; August 30, 2018; and April 11, 2019). As a matter of reasonable inference, the Court finds that Corrado was paid $1,050 per five-day week during his employment with Everlast between August 15, 2019 and January 2021. This equates to a daily rate of $210. For the slow months, when the Court credits Everlast employees work 9.5 hours per day, the Court will apply an hourly rate of $22.11 ($1,050 divided by 47.5 hours). During the busy months, when the Court credits Everlast employees work 11 hours per day, the Court will apply an hourly rate of $19.09 ($1,050 divided by 55 hours).

As shown in the appendix, after calculating the applicable rate (the overtime rate minus the hourly rate), the Court finds that Corrado is owed $4,304.93 for unpaid overtime under the FLSA, plus $4,304.93 in liquidated damages.

## VI.  Opt-in Plaintiff Gerard Pietrafesa

Plaintiffs assert that Pietrafesa worked for Everlast between June 2018 and June 2019, and Defendants do not dispute this. *See* Pl. Mem. at 42; Def. Mem. at 23. Defendants produced daily count sheets and payroll records that confirm this period of employment. *See* Ex. E-3 (daily count sheets); Ex. E-4 (payroll). The Court credits the documentation produced by Defendants. Pietrafesa's dates of employment occurred before August 15, 2019 and thus fall outside of the two-year FLSA statute

of limitations for non-willful violations.  Accordingly, the Court finds that Pietrafesa's claim is time-barred and that he may not recover unpaid overtime or vehicle expenses under the FLSA.

## VII.  Opt-in Plaintiff James Perez

Plaintiffs assert that Perez worked for Everlast from October 10, 2019 through February 13, 2020, and Defendants do not dispute this.  *See* Pl. Mem. at 41; Def. Mem. at 21–22.  Defendants produced records confirming this tenure of employment. *See* Ex. G-3 (daily count sheets); G-4 (payroll).  The Court credits the documentation produced by Defendants.  Because Perez's tenure with Everlast spanned both the busy months (March through October) and the slow months (November through February), the Court will award him overtime for the five-day weeks he worked between November 2019 and February 2020 and for the four- and five-day weeks he worked in October 2019.

The Court finds Perez worked 2 five-day weeks (October 11 to 17, 2019 and October 18 to 24, 2019) and 1 four-day week (October 25 to 31, 2019) during the busy months (March through October), and 7 five-day weeks (November 8 to 14, 2019; November 15 to 21, 2019; December 6 to 12, 2019; December 13 to 19, 2019; January 3 to 9, 2020; January 10 to 16, 2020; and January 24 to 30, 2020) during the slow months (November through February).

As for Perez's hourly rate, he was paid $950 for the five-days weeks for which he was fully compensated.  *Compare* Ex. G-4 (payroll records indicating pay of $950 on December 12, 2019), *with* Ex. G-3 (daily count sheets indicating five days worked between December 6 and 12, 2019).  This indicates a daily rate of $190 per day.  For

the slow months, when the Court credits Everlast employees work 9.5 hours per day, the Court will apply an hourly rate of $20.00 ($950 divided by 47.5 hours). During the busy months, when the Court credits Everlast employees work 11 hours per day, the Court will apply an hourly rate of $17.27 ($950 divided by 55 hours).

As shown in the appendix, after calculating the applicable rate (the overtime rate minus the hourly rate), the Court finds that Perez is owed $818.76 for unpaid overtime under the FLSA, plus $818.76 in liquidated damages.

## VIII. Opt-in Plaintiff Carlos Patrick

Plaintiffs assert that Patrick worked for Everlast from August 2020 to February 2021. *See* Pl. Mem. at 39. Defendants contest this, asserting that Patrick began working on October 13, 2020 and worked for approximately 4 weeks. *See* Def. Mem. at 8. Defendants produced records indicating that Patrick worked for Everlast between October 13, 2020 and approximately November 12, 2020. *See* Ex. H-5 (employment agreement dated October 13, 2020); Ex. H-6 (daily count sheets); Ex. H-7 (payroll). The Court credits the documentation produced by Defendants. Because Patrick's tenure with Everlast spanned both the busy months (March through October) and the slow months (November through February), the Court will award him overtime for the four- and five-day weeks he worked in October 2020 and for the five-day weeks he worked in November 2020.

The Court finds Patrick worked 2 five-day weeks (October 16 to 22, 2020 and October 23 to 29, 2020) during the busy months (March through October). Defendants concede that Patrick worked "two full weeks" for Everlast. Def. Mem. at

94

8. Patrick did not work any four-day weeks in October 2020 or five-day weeks in November 2020.

As for Patrick's hourly rate, he was paid $925 for the five-days weeks he worked. *See* Ex. H-7 (payroll records indicating pay of $925 on October 22 and 29, 2020). This indicates a daily rate of $185 per day. During the busy months, when the Court credits Everlast employees work 11 hours per day, the Court will apply an hourly rate of $16.82 ($925 divided by 55 hours).

As shown in the appendix, after calculating the applicable rate (the overtime rate minus the hourly rate), the Court finds that Patrick is owed $252.30 for unpaid overtime under the FLSA, plus $252.30 in liquidated damages.

## IX.   Opt-in Plaintiff Mauricio Tije

Plaintiffs assert that Tije worked at Everlast from March 30, 2021 through June 17, 2021, and Defendants do not dispute this. *See* Pl. Mem. at 38–39; Def. Mem. 9–10. Defendants provided daily count sheets and payroll records for this period. *See* Ex. O-2 (daily count sheets); Ex. O-3 (payroll).

The Court will generally credit the records produced by Defendants, notwithstanding certain unexplained inconsistencies between the payroll and daily count documents and indicia of unreliability. *Compare* Ex. O-2 (daily count sheets reflecting five days worked between April 26 and April 30, 2021), *with* Ex. O-3 (payroll records indicating payment on April 29, 2021 for three workdays and payment on April 30, 2021 for one workday); *see also* Ex. O-2 (daily count sheets containing an entry on February 10, 2021, a month before Tije began working for Everlast). Because Tije's entire employment with Everlast occurred between March

and October, the Court will award him overtime wages for four- and five-day weeks worked during his tenure, based on the daily count sheets and payroll records.

The Court finds that Tije worked 1 six-day week (April 30 to May 6, 2021), 3 five-day weeks (April 9 to 15, 2021; May 21 to 27, 2021; and June 4 to 10, 2021), and 3 four-day weeks (April 23 to 29, 2021; May 7 to 13, 2021; and April 28 to May 3, 2021).

As for Tije's hourly rate, the parties agree that he was paid $185 per day of work. *See* Ex. 22; Def. Mem. 9. Because Tije's tenure with Everlast fell entirely between March and October, the Court credits him with working 11 hours per day. Accordingly, the Court will apply an hourly rate of $16.82 ($185 divided by 11 hours).

As shown in the appendix, after calculating the applicable rate (the overtime rate minus the hourly rate), the Court finds that Tije is owed $698.03 for unpaid overtime under the FLSA, plus $698.03 in liquidated damages.

## X. Opt-in Plaintiff Angelo Amendolia

The parties generally agree that Amendolia worked for Everlast between the months of April and June 2019. *See* Pl. Mem. at 40; Def. Mem. at 10. Defendants provided daily count and payroll records which confirm this period of employment. Ex. N-2 (daily count sheets); Ex. N-3 (payroll). The Court credits the documentation produced by Defendants. Whatever differences exist between the parties' accounts are immaterial, because Amendolia's dates of employment occurred before August 15, 2019, and thus fall outside of the two-year FLSA statute of limitations for non-willful violations. Accordingly, the Court finds that Amendolia's claim is time-barred and that he may not recover unpaid overtime or vehicle expenses under the FLSA.

### XI.  Opt-in Plaintiff Steven Sforza

The parties are at odds concerning when Sforza worked for Everlast.  Plaintiffs contend he worked for approximately 2 months in 2016 and/or 2017.  Pl. Mem. at 41. Defendants produced records suggesting he worked for approximately 3 weeks in April 2019.  Ex. P-2 (payroll).  The Court need not resolve this factual dispute.  In either event, Sforza's dates of employment occurred before August 15, 2019 and thus fall outside of the two-year FLSA statute of limitations for non-willful violations. Accordingly, the Court finds that Sforza's claim is time-barred and that he may not recover unpaid overtime or vehicle expenses under the FLSA.

### XII.  Opt-in Plaintiff Andrew Rainis

Plaintiffs assert Rainis worked for Everlast between December 2019 and July 2020.  *See* Pl. Mem. at 40.  Defendants do not expressly contest this, but did produce records indicating Rainis worked from December 2019 through June 2020.  *See* Def. Mem. at 11; Ex. J-4 (daily count sheets); Ex. J-5 (payroll).  The Court credits the documentation produced by Defendants.  Because Rainis's tenure with Everlast spanned both the busy months (March through October) and the slow months (November through February), the Court will award him overtime for the five-day weeks he worked between December 2019 and February 2020 and for the four- and five-day weeks he worked between March 2020 and June 2020.

The Court finds Rainis worked 8 five-day weeks (December 6 to 12, 2019; December 13 to 19, 2019; January 3 to 9, 2020; January 10 to 16, 2020; January 24 to 30, 2020; January 31 to February 6, 2020; February 7 to 13, 2020; and February 21 to 27, 2020) during the slow months (November through February), and 2 five-day

weeks (March 6 to 12, 2020; June 19 to 25, 2020) and 3 four-day weeks (February 28 to March 5, 2020[28]; March 13 to 19, 2020; and April 17 to 23, 2020) during the busy months (March to October).

As for Rainis's hourly rate, he was paid $775 for the five-days weeks for which he was fully compensated.  *Compare* Ex. J-5 (payroll records indicating pay of $775 on February 13, 2020), *with* Ex. J-4 (daily count sheets indicating five days worked between February 7 and 13, 2020).  This indicates a daily rate of $155 per day.  For the slow months, when the Court credits that Everlast's employees worked 9.5 hours per day, the Court will apply an hourly rate of $16.32 ($775 divided by 47.5 hours).  During the busy months, when the Court credits Everlast employees work 11 hours per day, the Court will apply an hourly rate of $14.09 ($775 divided by 55 hours).

As shown in the appendix, after calculating the applicable rate (the overtime rate minus the hourly rate), the Court finds that Rainis is owed $775.13 for unpaid overtime under the FLSA, plus $775.13 in liquidated damages.

### XIII. Opt-in Plaintiff Gerard Norelius

The parties agree Norelius worked briefly for Everlast over a two-week period at the end of September and beginning of October 2020.  *See* Pl. Mem. at 42; Def. Mem. at 11.  Defendants' produced records that confirm this period of employment.

---

[28] Because this week spans the last day of the slow season (9.5 hours per day) and the first days of the busy season (11 hours per day), the Court deems Rainis to have worked 42.5 hours during this week (one day of 9.5 hours and three days of 11 hours).  The Court will apply the busy month hourly rate for overtime worked during this week.

*See* Ex. I-1 (employment agreement dated September 22, 2020); I-4 (daily count sheet); I-5 (payroll).  The Court credits the documentation produced by Defendants.

Because Norelius's entire employment with Everlast occurred between March and October, the Court will award him overtime wages for the single five-day week (September 28 to October 2, 2020) he worked, based on the daily count and payroll documents.

As for Norelius's hourly rate, he was paid $925 for the single five-day week he worked, indicating a daily rate of $185 per day.  For this five-day week that the Court credits Norelius worked 11 hours per day (March through October), the Court will apply an hourly rate of $16.82 ($925 divided by 55 hours).

As shown in the appendix, after calculating the applicable rate (the overtime rate minus the hourly rate), the Court finds that Norelius is owed $126.15 for unpaid overtime under the FLSA, plus $126.15 in liquidated damages.

## XIV. Opt-in Plaintiff Andre Anderson

The parties disagree as to when Anderson worked for Everlast. Plaintiffs assert he worked for approximately 3 months during the summer of 2019, while Defendants claim he worked for 3 weeks in August 2019.  *See* Pl. Mem. at 39; Def. Mem. at 18.  Defendants produced records confirming Anderson's three-week tenure with Everlast.  *See* Ex. D-2 (daily count sheet); Ex. D-4 (payroll).  The Court credits the documentation produced by Defendants.

Because Anderson's entire employment with Everlast occurred between March and October, the Court will award him overtime wages for the single four-day week

(August 16 to 22, 2019) he worked within the FLSA statute of limitations, based on the daily count and payroll documents.

As for Anderson's hourly rate, he was paid $700 for the single four-day week he worked, indicating a daily rate of $175 per day.  For this four-day week that the Court credits Anderson worked 11 hours per day (March through October), the Court will apply an hourly rate of $15.91 ($700 divided by 44 hours).

As shown in the appendix, after calculating the applicable rate (the overtime rate minus the hourly rate), the Court finds that Anderson is owed $31.84 for unpaid overtime under the FLSA, plus $31.84 in liquidated damages.

## XV.  Opt-in Plaintiff Samuel Blue

The parties disagree as to when Blue worked for Everlast.  Plaintiffs assert he worked for approximately 4 months in 2020, while records produced by Defendants indicate that he began working in July 2019 and that the last day was August 15, 2019.  *See* Pl. Mem. at 38; Ex. K-2 (daily count sheet); Ex. K-3 (payroll).  The Court credits the documentation produced by Defendants.

Because Blue's entire employment with Everlast occurred between March and October, the Court will award him overtime wages for the single four-day week (August 9 to 15, 2019) he worked, based on the daily count and payroll documents. *See* Ex. K-3 (indicating a final paycheck on August 15, 2019).  Though the rest of Blue's tenure is beyond the FLSA statute of limitations, his final paycheck is within it, entitling him to compensation for unpaid overtime on that paycheck.  *See Shu Qin Xu*, 111 F. Supp. 3d at 277 ("A cause of action under the FLSA accrues on the regular

payday immediately following the work period for which services were rendered and not properly compensated." (citation modified)).

As for Blue's hourly rate, he was paid $900 for the five-day weeks he worked in 2019. *Compare* Ex. K-2 (showing five days worked between July 26 and August 1, 2019), *with* Ex. K-3 (showing payment of $900 on August 1, 2019). This indicates a daily rate of $180. For the four-day week that the Court credits Blue worked 11 hours per day (March through October), the Court will apply an hourly rate of $16.36 ($900 divided by 55 hours).

As show in the appendix, after calculating the applicable rate (the overtime rate minus the hourly rate), the Court finds Blue is owed $32.72 for unpaid overtime under the FLSA, plus $32.72 in liquidated damages.

## XVI. Opt-in Plaintiff Oneil Parkes

The parties disagree about when Parkes began working for Everlast. Plaintiffs assert he worked from April 2020 through October 2020, while Defendants assert he began working July 2, 2020. *See* Pl. Mem. at 39; Def. Mem. at 22. Defendants produce records indicating Parkes worked from July 2, 2020 until October 15, 2020. *See* Ex. L-2 (daily count sheets); Ex. L-3 (payroll). The Court credits the documentation produced by Defendants. Because Parkes's entire employment with Everlast occurred between March and October, the Court will award him overtime wages for four- and five-day weeks worked during his tenure, based on the daily count sheets and payroll records.

The Court finds that Parkes worked 6 five-day weeks (July 10 to 16, 2020; July 24 to July 30, 2020; August 7 to 13, 2020; August 21 to 27, 2020; August 28 to

September 3, 2020; and October 2 to 8, 2020) and 5 four-day weeks (July 3 to 9, 2020; July 17 to 23, 2020; July 31 to August 6, 2020; September 11 to 17, 2020; and October 9 to 15, 2020).

As for Parkes's hourly rate, he was paid $900 for the five-day weeks he worked, indicating a daily rate of $180 per day. For the four- and five-day weeks in which the Court finds that Anderson worked 11 hours per day (March through October), the Court will apply an hourly rate of $16.36 ($900 divided by 55 hours).

As shown in the appendix, after calculating the applicable rate (the overtime rate minus the hourly rate), the Court finds that Parkes is owed $899.80 for unpaid overtime under the FLSA, plus $899.80 in liquidated damages.

### XVII. Opt-in Plaintiff Yuri Obligenhart

The parties agree that Obligenhart worked for Everlast for approximately 3 weeks between the end of April 2023 and May 2023. *See* Pl. Mem. at 40; Def. Mem. at 24. Defendants produced records that confirm this tenure of employment. *See* Ex. F-2 (daily count sheet); Ex. F-3 (payroll). The Court credits the documentation produced by Defendants. Because Obligenhart's entire employment with Everlast occurred between March and October, the Court will award him overtime wages for the single five-day week (May 5 to 11, 2023) and the single four-day week (May 12 to 18, 2023) he worked, based on the daily count and payroll documents.

As for Obligenhart's hourly rate, he was paid $1,000 for the single five-day week, indicating a daily rate of $200. For the four- and five-day weeks that the Court credits Obligenhart worked 11 hours per day (March through October), the Court will apply an hourly rate of $18.18 ($1,000 divided by 55 hours).

As shown in the appendix, after calculating the applicable rate (the overtime rate minus the hourly rate), the Court finds that Obligenhart is owed $172.71 for unpaid overtime under the FLSA, plus $172.71 in liquidated damages.

## XVIII.    Post-Judgment Interest

Plaintiffs have not requested post-judgment in their post-trial submission. However, "an award of postjudgment interest is mandatory." *Schipani v. McLeod*, 541 F.3d 158, 165 (2d Cir. 2008) (citing 28 U.S.C. § 1961(a) and *Westinghouse Credit Corp. v. D'Urso*, 371 F.3d 96, 100 (2d Cir. 2004)).  Accordingly, Plaintiffs are entitled to post-judgment interest "from the date of the entry of the judgment, at a rate equal to the weekly average 1-year constant maturity Treasury yield, as published by the Board of Governors of the Federal Reserve System, for the calendar week preceding the date of the judgment." *Feuer*, 2020 WL 401787, at *12 (citation modified) (quoting 28 U.S.C. § 1961(a)).  Accordingly, the Court concludes that Plaintiffs shall be awarded post-judgment interest on the entire monetary award, including pre-judgment interest and liquidated damages, to be calculated by the Clerk of the Court pursuant to 28 U.S.C. § 1961(a).

## XIX. Attorney's Fees, Costs, and Expenses

"The FLSA and NYLL both allow for a successful plaintiff to recover reasonable attorney's fees." *Bozdogan*, 2022 WL 4273851, at *10 (citation modified) (citing 29 U.S.C. § 216(b) and NYLL § 663(1)).  Thus, Plaintiffs are entitled to an award of attorney's fees and costs under the FLSA.

Plaintiffs have not yet submitted a motion for attorney's fees.  Thus, to the extent Plaintiffs are seeking an award, Plaintiffs shall file an application for

attorney's fees within fourteen (14) days of the date of entry of judgment. Defendants' opposition shall be filed within fourteen (14) days thereafter. Plaintiffs' reply, if any, shall be filed within seven (7) days after the filing of Defendants' opposition.

## **CONCLUSION**

As noted in the Court's oral ruling at the conclusion of this bench trial, the Court had no difficulty finding that the Plaintiff-installers were employees of Everlast who were entitled to the full protections of the FLSA and NYLL. Their consistent, highly credible testimony made clear that these were hardworking individuals who were hired by Everlast with no background or expertise in sign installations. They "agreed" to the terms of Everlast's payment structure but often had little to no negotiating leverage regarding the conditions of their employment because of their personal circumstances (including prior criminal convictions, child support obligations, or other economic pressures). They performed the essential work of Everlast's business under physically demanding and tiring conditions — driving in their own vehicles throughout the Eastern District of New York for 10- to 12-hour shifts, installing and removing signs in a range of weather conditions, and with little to no time to stop for breaks or meals if they were to complete their day's assignments. They did so for a flat "day rate" that did not vary based on the hours they actually worked. And they were required to use their own vehicles for Everlast's benefit, without any compensation for fuel or the wear and tear on those vehicles, even when they drove those vehicles on the job for hundreds of miles each week.

All of this was done in clear violation of the requirements of the FLSA and NYLL. Though the Court credits the testimony of Everlast's current co-owners that they did not willfully disregard the law, they nonetheless fell short of their demanding burden to prove that they acted in good faith when they failed to comply with the FLSA's and NYLL's plain terms. And while this Court does not find Plaintiffs' recollections of the specific days and weeks they worked all these years later sufficiently reliable to rebut Defendant's internal records (incomplete as those records were), Plaintiffs whose claims were timely filed are entitled to compensation for the overtime they worked. Ultimately, the recovery for certain Plaintiffs (particularly the opt-in Plaintiffs, who did not assert claims under the NYLL) is limited by the lower minimum wage and shorter statute of limitations under the FLSA.

Certain Plaintiffs whose wages fell below the New York state minimum wage are also entitled to "tools of the trade" damages for the use of their own vehicles on the days that they conducted sign installations and removals on Everlast's behalf and for spread-of-hours premiums for the days they worked more than 10 hours. Plaintiffs are also entitled to pre- and post-judgment interest and an award of reasonable attorney's fees.

SO ORDERED.

/s/ Nina R. Morrison
NINA R. MORRISON
United States District Judge

Dated: July 28, 2025
        Brooklyn, New York

105

## Appendix (Overtime Damages)

| Employee | March through October Overtime Differential | March through October Overtime Hours | November through February Overtime Differential | November through February Overtime Hours | Total |
|---|---|---|---|---|---|
| Rafter (2015 through Jan. 2020) | $9.09 | 1937 | $10.51 | 300 | $22,694.33 |
| Rafter (Feb. 2020 through Dec. 2020) | $9.55 | 257 | $11.06 | 30 | $2,786.15 |
| | | | | | **$25,480.48** |
| | | | | | |
| Kelly (2015 through Oct. 2018 | $9.09 | 901 | $10.51 | 75 | $8,978.34 |
| Kelly (Nov. 2018 through June 2019) | $9.55 | 184 | $11.06 | 75 | $2,586.70 |
| | | | | | **$11,565.04** |
| | | | | | |
| Simms | $8.18 | 369 | $9.48 | 22.5 | **$3,231.72** |
| | | | | | |
| Kovalsky | $8.18 | 57 | N/A | N/A | **$466.26** |
| | | | | | |
| Corrado | $9.55 | 375.5 | $11.06 | 65 | **$4,304.93** |
| | | | | | |
| Perez | $8.64 | 34 | $10.00 | 52.5 | **$818.76** |
| | | | | | |
| Patrick | $8.41 | 30 | N/A | N/A | **$252.30** |
| | | | | | |
| Tije | $8.41 | 83 | N/A | N/A | **$698.03** |
| | | | | | |
| Rainis | $7.05 | 40.5 | $8.16 | 60 | **$775.13** |
| | | | | | |
| Norelius | $8.41 | 15 | N/A | N/A | **$126.15** |
| | | | | | |
| Anderson | $7.96 | 4 | N/A | N/A | **$31.84** |
| | | | | | |
| Blue | $8.18 | 4 | N/A | N/A | **$32.72** |
| | | | | | |
| Parkes | $8.18 | 110 | N/A | N/A | **$899.80** |
| | | | | | |
| Obligenhart | $9.09 | 19 | N/A | N/A | **$172.71** |